UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MORGAN PIANKO,
                Plaintiff,

v.

GENERAL R.V. CENTER, INC.;
LOREN BAIDAS; CHRISTOPHER
DAVIS; JOY FOWLER; and
CHRISTOPHER MILLER,
                Defendants.
_____/

Case No. 20-cv-13371

Paul D. Borman
United States District Judge

Curtis Ivy, Jr.
United States Magistrate Judge

**OPINION AND ORDER**

**GRANTING IN PART AND DENYING IN PART DEFENDANTS
GENERAL R.V. CENTER, INC., LOREN BAIDAS, CHRISTOPHER
DAVIS, AND JOY FOWLER'S MOTION IN LIMINE TO EXCLUDE
OTHER ACT EVIDENCE (ECF NO. 82);**

**GRANTING GENERAL, BAIDAS, DAVIS, AND FOWLER'S MOTION IN
LIMINE TO PROHIBIT EVIDENCE AS TO THE EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION DETERMINATION (ECF NO. 83);**

**BIFURCATING THE LIABILITY AND DAMAGES PHASES OF
THIS CASE AND HOLDING IN ABEYANCE GENERAL, BAIDAS, DAVIS,
AND FOWLER'S MOTION IN LIMINE TO EXCLUDE FROM EVIDENCE
REGARDING THE SALARY AND FRINGE BENEFITS OF SALES
EMPLOYEES (ECF NO. 84);**

**GRANTING IN PART AND DENYING IN PART PLAINTIFF MORGAN
PIANKO'S APPEAL OF MAGISTRATE JUDGE CURTIS IVY, JR.'S JULY
20, 2022 ORDER (ECF NO. 116);**

1

**DENYING PIANKO'S OBJECTION TO MAGISTRATE JUDGE IVY'S
JANUARY 9, 2023 REPORT AND RECOMMENDATION (ECF NO. 136)
AND ADOPTING MAGISTRATE JUDGE IVY'S JANUARY 9, 2023
REPORT AND RECOMMENDATION;**

**GRANTING IN PART GENERAL, BAIDAS, DAVIS, AND FOWLER'S
MOTION FOR SUMMARY JUDGMENT (ECF NO. 96);**

**GRANTING IN PART DEFENDANT CHRISTOPHER MILLER'S
MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF NO. 104);**

**AND SETTING A HEARING ON THE REMAINING SUMMARY
JUDGMENT ISSUES FOR JUNE 8, 2023 AT 9:00 AM**

### Introduction

This case arises out of Defendant Christopher Miller allegedly assaulting Plaintiff
Morgan Pianko while the two were at an overnight business trip for their employer,
Defendant General R.V. Center, Inc. It also arises out of Pianko's departure from
General shortly thereafter.

Six filings are now before the Court. For the reasons that follow, the Court will
**GRANT IN PART** and **DENY IN PART** Defendants General, Loren Baidas,
Christopher Davis, and Joy Fowler's Motion in Limine to Exclude Other Act
Evidence (ECF No. 82), *see* Section III.A; **GRANT** General, Baidas, Davis, and
Fowler's Motion in Limine to Prohibit Evidence as to the Equal Employment
Opportunity Commission Determination (ECF No. 83), *see* Section III.B; **HOLD
IN ABEYANCE** General, Baidas, Davis, and Fowler's Motion in Limine to Exclude
from Evidence Regarding the Salary and Fringe Benefits of Sales Employees (ECF

No. 84), *see* Section III.C; **GRANT IN PART** and **DENY IN PART** Pianko's

Appeal of Magistrate Judge Curtis Ivy, Jr.'s July 20, 2022 Order (ECF No. 116), *see*

Section IV.A; **DENY** Pianko's Objection to Magistrate Judge Ivy's January 9, 2023

Report and Recommendation (ECF No. 136), *see* Section IV.B; **GRANT IN PART**

General, Baidas, Davis, and Fowler's Motion for Summary Judgment (ECF No. 96),

*see* Section V; and **GRANT IN PART** Miller's Motion for Partial Summary

Judgment (ECF No. 104), *see* Section V.

The Court finds that the briefing adequately addressed the issues to be decided in

this Opinion and so it dispenses with a hearing on these issues pursuant to E.D. Mich.

L. R. 7.1(f)(2).  The Court will set the remaining summary judgment issues for a

Hearing on **June 8, 2023** at **9:00 AM**.

# I. Statement of Facts[1]

**Pianko Joins General**

In May of 2014, Plaintiff Morgan Pianko began working for Defendant General R.V. Center, Inc. "as a detailer cleaning RVs in [General's] Wixom, Michigan dealership." (ECF No. 121-2, Affidavit of M. Pianko, PageID 7043.) "In approximately December 2014 or January 2015," Pianko was "promoted [] to a position as a biller or document assistant in Wixom." (ECF No. 121-2, PageID 7043.) Eventually, she also began working "when needed, . . . as a part-time sales person." (ECF No. 96-3, Dep. of M. Pianko, PageID 5857; ECF No. 121-2, PageID 7044.)

**General's Employee Manual Prohibits Harassment**

General's Employee Manual—at least as of 2015—contains the following "Sexual and Other Harassment" policy:

> General RV expects all employees to treat their fellow employees, customers, and others with respect. In keeping with this expectation, General RV will not tolerate any form of racial, ethnic, sexual or other harassment.
>
> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when:
>
> 1. Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment,

---

[1] Aside from where disputes are noted, these facts are set out in the light most favorable to Pianko.

2.  Submission to or rejection of such conduct is used as the basis for employment decisions affecting such individual, or

3.  Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

Other harassing conduct in the workplace is also prohibited. This can include, but is not limited to: crude or offensive language or jokes of a racial, ethnic or sexual nature; verbal abuse of a sexual, ethnic or racial nature; and the display in the workplace of sexually suggestive or ethnically or racially offensive objects or pictures.

Any employee who believes that he or she is being harassed should immediately report any incident(s) to his/her store manager, human resources, the owners, or corporate controller personally. ALL complaints of harassment will be investigated promptly in an impartial manner and as confidentially as possible. If the complaints are determined by General RV to have merit, measures for correcting the situation will be immediately taken. In no event will General RV retaliate against any employee for implementing in good faith the procedures of the policy. Any employee or supervisor who, after an appropriate investigation, is found to have engaged in harassment will be disciplined, up to and including termination.

Any manager or supervisor who is made aware of or observes sexual harassment and fails to inform [] his or her store manager, the owners or corporate controller will be subject to disciplinary action up to and including termination, as determined appropriate by General RV.

The above policy should also be followed if any employee believes that he or she is being harassed by a customer or other individual off-site while performing work on General RV's behalf.

(ECF No. 75-2, General Employee Manual (2015), PageID 2704–05; ECF No. 96-

6, General Employee Manual (2017), PageID 5983–84.)

5

The Manual also contains a "Non-Fraternization Policy" that, in an effort "[t]o prevent unwarranted sexual harassment claims, uncomfortable working relationships, morale problems among other employees, and even the appearance of impropriety," proscribes "managers and supervisors of General . . . from engaging in consensual romantic or sexual relationships with any managers, supervisors, or lower-level employees of General." (ECF No. 75-2, PageID 2705; ECF No. 96-6, 5984.)

**Pianko Occasionally Worked Offsite At RV Shows**

In addition to working at General's Wixom location, Pianko would occasionally work elsewhere "for RV shows." (ECF No. 96-3, PageID 5862–65.) General brought anywhere from 20 to 50 employees to these shows. (ECF No. 96-3, PageID 5862–65.) Pianko's job was to help the managers with paperwork, and "[a]ll of the managers" acted as her bosses at the shows. (ECF No. 96-3, PageID 5865.)

Sometimes the employees would stay at the show location overnight. (ECF No. 96-3, PageID 5862–65.) On those occasions, the employees might go to dinner or out to bars after the workday. (ECF No. 96-3, PageID 5866.) But "[e]ven after hours, [the employees] had General [] rules that [they] had to follow," such as requirements that they "be back at the location where [they] were staying by midnight" and that they not "drink too much to where [they were] going to look like [they] were drinking the night before when [they] show[ed] up to work" the next morning. (ECF

No. 96-3, PageID 5866–67.) The employees also still had to follow "all the other rules in the [General Employee] [Manual]." (ECF No. 96-3, PageID 5867.) At her deposition, Pianko stated that she had never been disciplined for breaking any of these rules but she believed that others had been, for "drinking too much or showing up late after curfew." (ECF No. 96-3, PageID 5867.)

**Pianko Is Harassed At An RV Show**

Once, at an RV show in Grand Rapids or Chicago, Pianko was talking at a bar with Josh Cremar, a General salesperson, and "Dennis," "another person that [they] worked with," and the conversation shifted to "how -- what happens at shows stays at shows." (ECF No. 96-3, PageID 5871–72.) Pianko "asked [Cremar], aren't you married, don't you have a baby at home," and Cremar "basically said he didn't care and then reached over and grabbed [Pianko's] boob." (ECF No. 96-3, PageID 5871.) In response, Pianko "slapped him across the face." (ECF No. 96-3, PageID 5871.)

Pianko reported the incident to Katie Short, General's Chief Financial Officer since 2005, and "filled out a written complaint." (ECF No. 96-3, PageID 5873; ECF No. 96-14, Dep. of J. Fowler, PageID 6029; ECF No. 123-4, Dep. of K. Short, PageID 7194, 7252–65.) Pianko "was told that [Cremar] would no longer be at any of the shows that [she was] at." (ECF No. 96-3, PageID 5873); *see also* (ECF No. 123-4, PageID 7252–65). She did not "hear[] one word about [the incident] [for some time] after" that, but she later learned that Cremar "was spoken to" and that her

report "went into his personnel file." (ECF No. 96-3, PageID 5874.) ((Cremar "did not agree [with Pianko's report] and wanted to dispute the claim." (ECF No. 121-10, J. Fowler ETO L. Baidas, PageID 7142.))

Nonetheless, despite what Pianko was told, Cremar "was at the very next show [that Pianko] was at." (ECF No. 96-3, PageID 5873.) The two did not speak. (ECF No. 96-3, PageID 5874.) They have not had any contact since then. (ECF No. 96-3, PageID 5875.)

**Pianko Attends An RV Show In Lansing With Miller (And Others)**

On the weekend of March 3, 2018, Pianko and other General employees were staying overnight to attend an RV show in Lansing, Michigan. (ECF No. 121-2, PageID 7044.) One other employee at the show was Defendant Chris Miller, General's "Corporate Sales Director." (ECF No. 121-2, PageID 7043–44.)

According to Pianko and some employees, Miller was Pianko's boss at the show and had the power to fire her. (ECF No. 121-2, PageID 7044; ECF No. 87-10, Dep. of J. Peelman, PageID 5164–65; ECF No. 96-15, Dep. of C. Davis, PageID 6143–45; ECF No. 121-6, Affidavit of K. Allen, PageID 7068.) Also according to Pianko, Miller was close personal friends with General's President, Defendant Loren Baidas. (ECF No. 121-2, PageID 7048.) Miller and Baidas, however, dispute that Miller was Pianko's boss and maintain that their (Miller and Baidas') relationship was purely professional. (ECF No. 38-8, Dep. of C. Miller, PageID 1029; ECF No. 96-13,

Affidavit of L. Baidas, PageID 6011–12; ECF No. 104-5, Affidavit of C. Miller, PageID 6420.)

Miller had a history of behaving inappropriately at work and work-related events. He viewed pornography on his work computer. (ECF No. 38-4, Affidavit of D. Lilac, PageID 887.) Once, while crashing a wedding on a sales trip in Mexico, with Baidas present, Miller told an offensive joke about a woman's breasts and subsequently got into a fight over it. (ECF No. 38-4, PageID 888; ECF No. 38-8, PageID 1075–76.) And for at least five years, he participated (through his work e-mail) in a fantasy baseball league, which included General employees and others, under some questionable team names. (ECF No. 38-8, PageID 967.) For example, after the incident in Mexico, Miller and Baidas were on a team named "Wedding Crashers"; in 2016, Miller was on a team named "Stick It In Her Buchholz." (ECF No. 38-4, PageID 888; ECF No. 38-8, PageID 974; ECF No. 38-9, Fantasy Baseball Email, PageID 1213.)

Furthermore, in violation of General's Non-Fraternization Policy, Miller had engaged in romantic relationships with multiple General employees, including Receptionists Samantha Wells and Erin Kennedy and Biller April McCormick. (ECF No. 38-2, Affidavit of S. Wells, PageID 882; ECF No. 38-4, PageID 888; ECF No. 87-11, Dep. of B. Slaughter, PageID 5261.) The relationships with Wells and Kennedy were well-known to employees at General's "Birch Run" dealership, and

Birch Run's Manager, Scott Dodge, knew about the relationship with Kennedy. (ECF No. 38-4, PageID 888.)

Miller has confirmed that he had a relationship with Erin Kennedy, but he explained that he received special permission from Baidas for it. (ECF No. 38-8, PageID 979–81.) (He also asserted that the only two General employees that he has "had a romantic relationship" with are Kennedy and Pianko. (ECF No. 38-8, PageID 977–78.))

Most seriously, Miller's conduct towards women had led to at least two complaints to management. First, on February 20, 2009, Lisa Kesselring Burton reported to Bob Green—General's Sales Director (ECF No. 38-3, Affidavit of M. Kirk, PageID 885)—that Miller had made "an inappropriate," sexual, "pink taco" "comment" during a Birch Run store sales meeting. (ECF No. 38-5, Employee Warning Notice and Emails, PageID 891–95.) She added that she had had "past . . . issues" with Miller making fun of her name, "[t]reating other employees in a demeaning and intimidating manor," acting "offensive[ly]" "outside of work at a bar," and "not doing "a very good job of running the sale floor." (ECF No. 38-5, PageID 891–95.)

Green told Burton that he "thought [Miller's] comment was inappropriate but not sexual[ly] demeaning," that he would "talk to other employees about the way they were being treated by [Miller]," that "things done outside of work that didn't involve

work between individuals was not a General [] issue," and that he (Green) and Baidas thought "very highly of [Miller]'s ability to run one of [their] most profitable stores." (ECF No. 38-5, PageID 893.) He also "let [Burton] know that [General] t[ook] her concerns very seriously and that [he] would address some of [them] with" Baidas, Miller, and Dodge. (ECF No. 38-3, PageID 885; ECF No. 38-5, PageID 893.)

Green met with Miller, who admitted to making the sexual comment. (ECF No. 38-5, PageID 893.) Green told Miller that the "comment was inappropriate," that "[t]he level of professional behavior [General] expect[ed] from [its] managers is very high and in all cases he must try to do a better job," that "[u]nder no circumstances [should] he relay any level of retribution against [Burton]" and "he [must] treat her with the respect that all General [] employees get from all [General] managers ALL THE TIME," and that "[w]hatever his level of behavior toward his staff ha[d] been [Green] expect[ed] it to be greatly improved going forward." (ECF No. 38-5, PageID 894.) On February 23, Miller was issued an "Employee Warning Notice" for the comment. (ECF No. 38-5, PageID 891.)

On February 25, Green told Baidas that Burton "seemed upset that [he] would not consider moving [Miller] to a different location." (ECF No. 38-5, PageID 894.) And he "recommend[ed that they] continue to keep a close eye on the situation in case it g[ot] worse." (ECF No. 38-5, PageID 894.)

On March 5, Green met with the Birch Run employees and "let them know that [General] expect[ed] the highest level of professional behavior from Managers to part time employees" and that "inappropriate behavior in a racial, sexual, sexist or religious nature [was] not tolerated by General." (ECF No. 38-5, PageID 895.) Green also let the employees "know that [General] h[ad] an open door policy with direct contact available to Rob, [Baidas] or [himself] to any employee that fe[lt] that they ha[d] been mistreated or put in an uncomfortable situation" and that "[t]here w[ould] be no retribution from any person at [G]eneral [toward anyone] that comes forward . . . with [] concerns or issues." (ECF No. 38-5, PageID 895.) Further, Green "spoke one on one with the managers and let them know that it was their responsibility to be aware of any mistreatment of employees and report it." (ECF No. 38-5, PageID 895.) And he offered that he "would be [at the Birch Run office] all morning and welcomed anyone that wanted to talk," but "[n]obody came in with any complaints or misgivings about the store." (ECF No. 38-5, PageID 895.)

Second, at some point during her time as a Finance & Insurance Manager at General from 2006 to 2011, Melinda Kirk complained about Miller's "inappropriate, harassing conduct," which included Miller making "sexual comments to [Kirk] about his [] genitals," texting a picture of his penis to Kirk, exposing his penis to Kirk at an after-work event at his house, and "[o]n one occasion, during working hours, . . . follow[ing] [Kirk] into an RV, without [her] knowledge or consent" and

"without warning, [] suddenly grabb[ing] [her] and forcibly kiss[ing] [her] on the lips." (ECF No. 38-3, PageID 884–85.) Kirk reported this "conduct to multiple General [] managers[,] including . . . [her] immediate supervisor, Larry Peter[], [] Dodge, . . . and [] Green," and she also "filed a written complaint [about it] with General['s] managers."  (ECF No. 38-3, PageID 885.) But, according to Kirk, "General [] did nothing to stop [] Miller from harassing [her]." (ECF No. 38-3, PageID 885.) (Peter does not recall Kirk ever "directly" complaining about Miller, but does remember her telling a story about "being at [Miller] and [Kennedy]'s house where [Miller] hit[] on [her]." (ECF No. 121-7, Dep. of L. Peter, PageID 7085.) Miller denies that he ever touched, kissed, or exposed himself to Kirk. (ECF No. 38-8, PageID 989–90.))[2]

Pianko maintains that she and Miller had never had any sexual or romantic contact prior to the Lansing show. (ECF No. 96-3, PageID 5894.) Miller has been ambiguously inconsistent on the issue. *Compare* (ECF No. 87-2, Police Report, PageID 4530) ("Miller [] said Pianko had been to his room on two other occasions, where they had kissed and touched, but had never had sexual intercourse."), *with*

---

[2] Additionally, at some point *after* Pianko left General, Cody Weiss reported to Dodge, Baidas, and Fowler that Miller was sending inappropriate text messages to his girlfriend, Alyssa Troxel, a salesperson at General's Birch Run location. (ECF No. 96-3, PageID 5879–80; ECF No. 38-8, PageID 1099–1101.) Baidas called Miller and "asked [him] what happened" and Miller "explained" and "sent him the text messages" in question. (ECF No. 38-8, PageID 1099.) Miller was not disciplined or even further questioned. (ECF No. 38-8, PageID 1102.)

(ECF No. 87-3, EEOC Interview of C. Miller, PageID 4548 ("[W]e always were friendly. You know, we, it was all, you know, nothing outside of a normal, you know, friendly relationship, you know."), *and* (ECF No. 87-4, State Court Dep. of C. Miller, PageID 4588–89, 4593) (reflecting Miller's testimony that he and Pianko "tried once" to "have sexual intercourse"), *and* (ECF No. 87-5, Dep. of C. Miller, PageID 4817–31) (reflecting Miller's testimony that he and Pianko kissed and touched in 2017).

Regardless, Pianko and Miller appear to agree that, prior to the Lansing show, Pianko had worked with Miller at other RV shows, seen him "occasionally" "at the Wixom location" "in passing," and discussed with him her aspiration to "receiv[e] a promotion . . . to a full time sales position at [the] Wixom store." (ECF No. 96-3, PageID 5860–62; ECF No. 121-2, PageID 7043–44.) Pianko thought that Miller's recommending her for a sales position "would carry tremendous weight since (a) [] Miller directly supervised all the sales managers at the Wixom location [and all the other locations, too]; and (b) one of the sales managers at the Wixom location was Miller's younger brother, Jeremy Miller." (ECF No. 121-2, PageID 7044.)

**Miller Harasses Pianko In Lansing**

On the night of March 3rd, Pianko spotted Miller as she was drinking with some other General employees in the lobby bar of their Lansing hotel. (ECF No. 121-2, PageID 7044.) Pianko's account of their subsequent interaction is as follows.

14

Pianko told Miller that she wanted to talk more, when they were back in the office, about her interest in a full-time sales position. (ECF No. 121-2, PageID 7045.) Miller suggested that they talk right then and that Pianko accompany him as he went outside to smoke a cigarette. (ECF No. 121-2, PageID 7045.) Pianko agreed. (ECF No. 121-2, PageID 7045.)

But then Miller led Pianko to the elevator, instead of outside, and told her that he had to get more cigarettes from his room. (ECF No. 121-2, PageID 7045.) When they got to Miller's room, Pianko waited in the hallway, until Miller told her that he wanted to make himself a drink and she should come in. (ECF No. 121-2, PageID 7045.) "After [] Miller made his drink, he took his belt off, walked towards his luggage, and began taking off his pants." (ECF No. 121-2, PageID 7045.) Pianko was "shocked" and "started to leave the room," but Miller told her to "[c]hill the f*** out" and that he was "just changing out of [his] work pants." (ECF No. 121-2, PageID 7045.)

Instead of putting on new pants, however, Miller "[e]xposed his testicles and penis to [Pianko] and ask[ed her], 'Actually, while we're here, will you do me a favor and touch my balls and tell me if you think they are smooth.'" (ECF No. 121-2, PageID 7045.) As Pianko refused, Miller "grabbed the shaft of his penis" while repeating this request." (ECF No. 121-2, PageID 7045–46.) Pianko continued to refuse; Miller said, "'Don't worry; as much as you want to have sex with me right

now, I'm not going to." (ECF No. 121-2, PageID 7045–46.)  "Miller laughed and acted like it was all a joke" and asked, "Seriously, you don't want to have sex with me right now?" (ECF No. 121-2, PageID 7046.) Pianko said no again, and she started to leave. (ECF No. 121-2, PageID 7046.)

But as Pianko began to turn the door handle with her left hand, Miller grabbed her right wrist and yanked on her five or six times. (ECF No. 121-2, PageID 7046.) As Miller was yanking on her, Pianko yelled "NO" and that she needed to leave: she feared that if she "let go of that door handle, [] Miller would rape [her]." (ECF No. 121-2, PageID 7046.) Eventually Pianko broke away. (ECF No. 121-2, PageID 7046.) On her way out, Miller told her, "Let me know if you change your mind.'" (ECF No. 121-2, PageID 7046.)

Pianko "ran back to [her] hotel room and cried." (ECF No. 121-2, PageID 7047.) It was around 1 or 2 AM. (ECF No. 121-2, PageID 7047.)

At 2:20 AM, Miller texted Pianko, asking if she "wanted [him] to come see [her]." (ECF No. 121-2, PageID 7047); *see also* (ECF No. 3-2, Text Messages, PageID 76–77). She responded that she needed to sleep and added, "Don't you think it would be in both of our best interests to keep things professional??" (ECF No. 3-2, PageID 76–77.)

Over the course of that night and the next day, Pianko told a few friends what had happened. (ECF No. 96-3, PageID 5891; ECF No. 96-4, M. Pianko ETO J.

Fowler, PageID 5976; ECF No. 121-3, Affidavit of S. Rydzewski, PageID 7057–58.)

**Pianko Reports Miller's Conduct And General Responds**

Pianko saw Miller at the show on Sunday, but she avoided him, and the two did not speak to each other. (ECF No. 96-3, PageID 5905.) She returned to the Wixom office on Monday, March 5th, and saw Miller in the hallway, and they said hello. (ECF No. 96-3, PageID 5907.) She "might have seen [Miller on] Tuesday, but [they] didn't speak." (ECF No. 96-3, PageID 5907.)

On Thursday, March 8th, at about 1 PM, Pianko emailed Defendant Joy Fowler, General's Human Resource Manager, about Miller's conduct at the Lansing show. Pianko recounted that Miller took his pants off in front of her and said, "as much as you want to have sex with me right now, I'm not going to." (ECF No. 3-3, M. Pianko ETO J. Fowler, PageID 78–80.) She left out the details of Miller asking her to touch his penis and yanking her away from the door. Nonetheless, she ended her email by stating:

> What Chris did to me is a complete abuse of his power. Chris is someone who should know better. I thought he was talking to me because he respected me as an employee. Now I feel like it was all a lie and I was nothing to him other than a young, vulnerable girl he could try to take advantage of.
>
> The worst part is knowing he's the one who should feel as awful as I do, but that it isn't the case. I am the one fighting the tears and the nightmares and fearing for my job.

> If Chris comes into our building today, seeing as he has been here the last two days, I hope you will understand that I need to leave and take a personal day.
>
> Honestly, I do not know who to turn to. I do not know whether to stay home, or if I should keep coming to work because I need my job.
>
> I am sending this email to you because you are the human resource manager, and I have nobody else to trust.
>
> Please let me know what you think.

(ECF No. 3-3, PageID 80.)

About 24 hours later, Fowler responded:

> My sincere apologies, I'm just getting to your email today.
>
> I will need to get Loren Baidas involved in this. We will keep it in confidence and no one else will know. You did the right thing.

(ECF No. 3-3, J. Fowler ETO M. Pianko, PageID 78.)

About an hour after that, Pianko replied: "Thank you for your email and your willingness to keep this in confidence. Do you how long this will take? Am I expected to come into work before this situation is resolved?" (ECF No. 121-9, M. Pianko ETO J. Fowler, PageID 7135.)

Fowler quickly wrote back:

> You can come to work. Just avoid any contact for now until I can get with Loren once he decides on a way to resolve. I am at another store today so I can't talk to him face to face. I'll be back on Monday. Are you using all paid time?

(ECF No. 121-9, J. Fowler ETO M. Pianko, PageID 7135.)

18

Then Pianko quickly answered: "Thank you. I don't know if I feel comfortable coming into work at this stage. If I am require to, I will use my vacation days. Please let me know after you've talked to Loren Monday." (ECF No. 121-9, PageID 7135.)

A half an hour later, Fowler sent Pianko an update:

> I spoke to Loren on the phone. He wants you to know that he is taking these allegations very seriously and he wants to assure you that we want you to feel safe in your work environment. Your job is not in jeopardy so please don't worry about that. This is a very serious matter and he is not taking this lightly. He said at some point he may need to speak with you.
>
> Please try to enjoy your weekend. I will be in contact soon.

(ECF No. 96-5, J. Fowler ETO M. Pianko, PageID 5979.)

On Monday, March 12, at 8:14 AM, Pianko emailed Fowler:

> I texted Angela to let her know I won't be in today. I just don't feel comfortable until I know what's going on. Please let me know as soon as you talk to Loren[.]

(ECF No. 96-5, M. Pianko ETO J. Fowler, PageID 5979.)

That same morning, Defendant Christopher Davis, General's Vice-President of Finance, and Baidas met with Miller. (ECF No. 38-8, PageID 1042–55; ECF No. 96-15, Dep. of C. Davis, PageID 6117.) They discussed Pianko's allegation and asked Miller to prepare a statement of his position on the issue. (ECF No. 38-8, PageID 1051.) At the end of the meeting or later that day, they informed Miller that he was suspended, (ECF No. 38-8, PageID 1053), and gave him a letter that explained:

In accordance with the violation of General RV Employee Handbook section on Sexual and Other Harassment (page 6 & 7), this is a Letter of Suspension. You will be suspended from General RV employment for 14 days starting on March 12th. You are not to report to work or to do any work on these days, including emails, phone calls, etc.

This action is based on the incident recorded on March 3rd in which you violated General RV's Sexual Harassment Policy.

Since this is your first incident on record at General RV Center in your 12 year work history, will only suspend you for 14 days without pay. In addition you will also be removed from all overnight travel for 6 months, probationary period, including shows and store visits. To avoid all contact with the person in question, you will also be removed from the Novi Show management team for a full year and will removed from all work on the main floor of the Wixom store for the remainder of the year. You will complete all sexual harassment training need before reinstatement.

In the future, you are expected to completely know and understand how to apply our Sexual Harassment Policy to your everyday work life at General RV.

Failure to meet these requirements may result in further disciplinary action up to and including dismissal.

(ECF No. 96-10, L. Baidas LTO C. Miller, PageID 5994.)

In an Affidavit, Baidas wrote that he was the one who "conducted the investigation into [] Pianko's complaint of sexual harassment against [] Miller" and "made the decision to discipline [] Miller and [on] the extent of the discipline." (ECF No. 96-13, PageID 6011–12.) (Pianko asserts that Baidas' investigation was inadequate, in part because he "only talked to friends of [] Miller who were with him on March 4, 2018 and made no notes about what these witnesses reported" and "did

not talk to [her] about who might be able to verify what happened that night." (ECF

No. 96-11, Pianko's Responses to Interrogatories, PageID 6006.))

The next morning, Miller emailed Baidas the following statement:

> On Saturday march 3rd after the show at the summit center, myself,
> Bryan Slaughter, Dominic Sinatra, and Anthony Sinatra went the the
> hotel restaurant to have dinner at approx. 9pm. After dinner we stayed
> there and had some drinks and watched basketball on the tv. We were
> later joined by Kayla Allen, Jeremy Latozas and Morgan Pionko. We
> had normal chit chat about sports. Morgan at one point asked to speak
> with me, we went outside to smoke a cigarette . she told me she was
> going to leave general rv and go sell cars, she expressed her frustration
> about not getting into the sales department with general rv. I asked if
> she discussed this with her managers and she said she did. I let her know
> that she needs to ask them why and what she can do to get into that
> department. At this point we went back inside and back to the group. I
> had a couple more drinks, and at approx. 11:45 I went out for one last
> cigarette before going to bed. Morgan followed me out and asked to
> have a cigarette. I gave her one and said I am going to my room. I asked
> if she would like to join me. She accepted I gave her my room number.
> I went back to the restaurant and said good night to everyone and
> proceeded to my room. Shortly after Morgan came up. I took my suit
> off and put sweat pants on, I never took my tee shirt or boxers off. We
> talked for a little bit and I asked if she would like to lay down, she laid
> her head on my chest and her arm over me, I had my left arm around
> her. We talked for a while, I kissed her, she kissed me back. She said it
> was time for her to leave, I said are you sure you want to leave, you
> don't want me? And she said no she was tired. And she left.

(ECF No. 96-7, C. Miller ETO L. Baidas, PageID 5988.)

Later that day, Pianko, accompanied by counsel, met with Baidas and Fowler at

a coffee shop and told them the details that she had left out of her original email to

Fowler—that Miller "expose[ed] his penis to [her], [] repeatedly asked [her] to touch

his testicles, and [] yank[ed] [her] hand as [she] tried to leave his room." (ECF No. 121-2, PageID 7048.)

The next day, March 14th, Pianko sent Baidas and Fowler an email, which she had prepared with her counsel, stating that she "fe[lt] like General [] [was] blaming [her] for what [Miller] did" and that Baidas' friendship with Miller was "chang[ing] the results of this." (ECF No. 121, PageID 7048, 7054.)[3]

That same day, Fowler sent Pianko the following letter, on company letterhead:

> You have requested to be off for an undetermined amount of time. Unfortunately, General RV Center, Inc. does not have a leave policy that covers your absences.
>
> If you feel that you may be eligible for Family Medical Leave, please contact me for the paperwork required for this type of leave. You can reference your employee handbook under 'Unpaid Leave of Absence' for explanation of qualifying absences.
>
> Failing to return to work by Monday, March 19, 2018 will be considered a voluntary resignation.
>
> Please contact me if you need any further questions.

(ECF No. 96-12, J. Fowler LTO M. Pianko, PageID 6009.) Baidas has attested that "[i]t was [his] decision to terminate [Pianko's] employment if she failed to return to work" on March 19th. (ECF No.  96-13, PageID 6012.)

---

[3] The record includes only a version of this email sent between Pianko and her counsel. (ECF No. 96-8; ECF No. 96-9.) But Pianko has stated that she sent it to Baidas and Fowler. (ECF No. 121-2, PageID 7048.) And General, Baidas, and Fowler have agreed that she did so. (ECF No. 96, PageID 5784.)

The record reflects some disagreement and confusion about the type of time off Pianko had taken that week and what additional time off she may have had left at the end of it. Baidas and Fowler have explained that General "allows an employee to take up to 5 days unpaid leave for personal use." (ECF No. 96-13, PageID 6012; ECF No. 96-16, Affidavit of J. Fowler, PageID 6171.) And CFO Short has elaborated that General may "work it out with [] employee[s]" to extend their available time off "based on circumstance[s]": for example, if an employee has "vacation time left," General might "work it out that [they] take a vacation day and [then] might take a couple of unapproved days and then [] might take another vacation day and then . . . two or three [more] unapproved days." (ECF No. 123-4, PageID 7252–75.) Baidas and Fowler assert that Pianko "was provided an unpaid leave under [this] policy" and was not required "to use vacation time for any time off after her complaint." (ECF No. 96-13, PageID 6012; ECF No. 96-16, PageID 6171.)

In contrast, Pianko contends that she eventually "found out that [General] had forced [her] to use [her] vacation days" to account for her absence after March 12th. (ECF No. 96-3, PageID 5948.) She notes that "General['s] Handbook allowed [her] to take 10 paid vacation days each year," five of which had to be used at Christmas, "plus one [] additional paid personal day." (ECF No. 96-3, PageID 7049.) However, she states, she did not receive payment for any unused vacation days when she was

terminated on March 19th. (ECF No. 121-2, PageID 7049.) She also states that she did not receive payment for her personal day, which she would not have used even if General had treated her previous five days off as vacation days. (ECF No. 121-2, PageID 7049.) And she avers that General never "inform[ed] [her] that [she] could (a) take up to 5 days unpaid leave for personal use, (b) [] was entitled to one paid personal day; or (c) [] was granted a 'No Pay Approval' leave of absence." (ECF No. 121-2, PageID 7049.)

In any case, Pianko states that, after receiving the letter directing her to return to work on March 19th, she "reviewed the FMLA policy in the Handbook" and found that she "did not qualify . . . because [she] was not suffering from a 'serious health condition' as defined in the Handbook." (ECF No. 121-2, PageID 7049); *see also* (ECF No. 75-2, PageID 2724–29) (setting out General's FMLA policy). Still, she did not return to work on the 19th. Instead, she emailed Baidas and Fowler that day with the following:

> I understand General RV has closed its investigation into this matter and Chris will receive no other discipline beyond what your lawyer described in her March 13 email.
>
> On Friday [March 16th], I received Joy's letter telling me that if I do not return to work by today, General RV will consider me to have voluntarily quit.
>
> I cannot believe this is how General RV is treating me after I reported what Chris did to me. Do you really think telling Chris to stay away from the Wixom building and not talking to me is going to make my

work environment any more tolerable? For starters, his brother works in my building.

What would either of you tell a family member to do if this happened to her??

Not to even mention, I am sure you know, this is NOT the first time Chris has acted this way with younger women like me. I have since learned of at least one other time.

Also, I am sure you also aware of other managers or supervisors violating company policy by having sexual relationships with lower-level employees. For example, Bryan Slaughter and Kayla Allen, as well as Jeremy Miller and other females (Jackie Robsinon and Caitlyn Drewyour)

I really believed General RV was a family run business and would treat its employees with dignity and respect. Giving Chris a pass on what he did to me tells me that General RV is not the type of place where I feel safe or protected.

Even my prior complaint about another sales person touching me inappropriately at a Chicago show in 2015 was ignored. Josh Cramer. I spoke with Katie Short and wrote a report. She told me I'd never have to see him at another RV show again… guess who was at the very next show with me??

I believe your treatment of me is unfair and you are retaliating against me for speaking out. I am deeply hurt and offended by what Chris did to me and General RV's reaction. I do not know how you expect me to return to work under these conditions.

I am not leaving voluntarily. I am being terminated, and both of you know it.

(ECF No. 3-5, M. Pianko ETO J. Fowler, PageID 82–83.)

Baidas responded the next day:

25

General RV is sorry you feel you are unable to return to work. If you change your mind in the future, and your position, or another suitable position, is available, you are welcome to return.

Morgan, after you voiced your complaint we conducted an investigation which included discussing your allegations with Mr. Miller. Mr. Miller admitted to you consensually going to his room but has denied your allegations, such as, exposing himself or asking you to touch him. Since there would not be any witnesses to the actions in the room, the investigation was concluded.

Based upon the investigation Mr. Miller was disciplined, he was suspended without pay and prohibited from performing any duties that would allow him to be in your working location (in or out of the Wixom building). Also, neither I nor Joy have discussed this matter with any of your coworkers. I believe that these actions would have prevented any interaction between you and Mr. Miller and ensured that you were not treated differently by your co-workers or supervisors. Our goal was to ensure that upon your return to work, you were not retaliated against by anyone and you had a safe and comfortable working environment. I am sorry you don't believe this to be true.

(ECF No. 3-5, L. Baidas ETO M. Pianko, PageID 82.)

Separately, but also on March 20, Fowler and Baidas emailed about Pianko amongst themselves. Fowler wrote to Baidas:

So, this morning Cheryl Page came to Katie's office crying. Katie called me in to join them.

In 2015 apparently Cheryl's daughter Ariel (who was 17 at the time) had sex with Chris Miller at the Lansing Show. Cheryl is extremely upset and remembers quite well that Ariel wanted her to come to Lansing to get her that day. Lori MacDonald ended up driving Ariel home early on Sunday. Drinking was involved and I somewhat remember the situation but recall that Ariel was extremely drunk and could not work due to being sick and hung over.

I also researched the Josh Cremer incident and Katie and I found it in

26

the Disciplines in 2015. This happened when Josh grabbed Morgan when they were with Dennis Anderson. Josh did not agree and wanted to dispute the claim.

Also – Cheryl's daughter Angel knows firsthand that Morgan has slept with Jeremy Miller. This happened 2 years ago at Waldenwoods Christmas party.

At lot to think about. Seems that this is why Morgan was insistent about working with Jeremy was not going to work. Also, confirms she's not quite the angel either.

(ECF No. 121-10, PageID 7141-42.) And she later followed up:

Morgan has called Ariel and asked her to testify that this happened to her also. Ariel told Cheryl on Friday that Morgan is really bugging her to testify. Cheryl was upset and came in today to tell us.

Morgan mentioned that she still had to work with Jeremy when we met her last week. I was just surprised to hear that she has actually slept with him. This may or may not work in our favor.

(ECF No. 121-10, PageID 7141.)

Baidas responded, carbon copying Suzanne Bartos, General's counsel:

Ok. So Morgan knew of this alleged incident with chris 3 years ago, didn't report it then[4] and still went to his room two weeks ago. We should relay this information to Sue so she has all the information we have.

(ECF No. 121-10, L. Baidas ETO J. Fowler, PageID 7140.)

---

[4] Pianko disputes this characterization and maintains that she did not know of the incident until Ariel told her about it around March 20, 2018. (ECF No. 121-2, PageID 7050.)

Bartos replied: "we will keep it in the arsenal. It is also to our benefit that nothing happened to her after the earlier complaint, why did she think something would happen this time? Why cant she work this time when she did the last time?" (ECF No. 121-10, S. Bartos ETO J. Fowler, PageID 7140.)

## II. Procedural History

Around April 10, 2018, Pianko filed a criminal complaint against Miller, alleging that he assaulted or assaulted and battered her. (ECF No. 9-3, Misdemeanor Complaint, PageID 261.) Prosecutors brought the case, and Miller ultimately pled "No Contest." (ECF No. 7-10, Misdemeanor Plea, PageID 179.)

Additionally, on April 9, 2018, Pianko "filed with the Equal Employment Opportunity Commission ('EEOC') sex harassment and retaliation charges against General." (ECF No. 3, PageID 60.) On June 4, 2020, the EEOC entered a Determination in which it found that "[e]vidence gathered during the investigation reveals that there is reasonable cause to believe that the Charging Party's sexual[] harassment and retaliation charges are true" and "invite[d] the parties join with it in a collective effort toward a just resolution of th[e] matter." (ECF No. 3-6, EEOC Determination, PageID 84.) On September 25, 2020, the EEOC issued a Right to Sue letter. (ECF No. 3, PageID 60.)

Pianko filed this case against General, Baidas, Davis, Miller, and Fowler on December 23, 2020.[5] (ECF No. 1.) She amended her complaint on January 11, 2021. (ECF No. 3.) In her Amended Complaint, Pianko brings the following counts:

---

[5] Previously, in February of 2020, Pianko filed a case against Miller for Assault & Battery in Oakland County Circuit Court. (ECF No. 9-5, Oakland Complaint.) But on February 10, 2021, upon Pianko's request, the Oakland Court dismissed that case without prejudice. (ECF No. 9-7, Voluntary Dismissal Order.)

1. Sex Harassment Discrimination in Violation of Title VII of the Civil Rights Act (against all Defendants);

2. Sex Harassment Discrimination in Violation of the Elliott-Larsen Civil Rights Act ("ELCRA") (against all Defendants);

3. Retaliation in Violation of Title VII (against all Defendants);

4. Retaliation in Violation of the ELCRA (against all Defendants);

5. Tortious Interference with a Business Relationship (against Miller);

6. Tortious Interference with a Business Relationship (against Baidas);

7. Civil Conspiracy/Concert in Action (against all Defendants);

8. Intentional Infliction of Emotional Distress (against Miller); and

9. Assault & Battery (against Miller).

(ECF No. 3.)

On July 28, 2021, the Court dismissed part of Count 9. (ECF No. 14, PageID 603.)

On June 14, 2022, General, Baidas, Davis, and Fowler filed three (Amended) Motions in Limine: to Exclude Other Act Evidence (ECF No. 82), to Prohibit Evidence as to the EEOC Determination (ECF No. 83), and to Exclude from Evidence Regarding the Salary and Fringe Benefits of Sales Employees (ECF No. 84). Pianko responded to these Motions between August 15 and August 17, 2022. (ECF Nos. 119, 120, 122.) And General, Baidas, Davis and Fowler replied to Pianko's Response to their Motion to Prohibit Evidence as to the EEOC

Determination on August 30, 2022. (ECF No. 131.) (They did not reply to Pianko's two other Responses.)

General, Baidas, Davis, and Fowler jointly moved for summary judgment on all the counts against them—Counts 1, 2, 3, 4, 6, and 7—on July 7, 2022. (ECF No. 96.) Pianko responded on August 17, 2022 (ECF No. 123), and General, Baidas, Davis, and Fowler replied on August 19, 2022 (ECF No. 129).

Miller separately moved for partial summary judgment on Counts 2, 4, 5, and 7 on July 14, 2022. (ECF No. 104.) Pianko responded to Miller on August 16, 2022 (ECF No. 121), and Miller replied on September 6, 2022 (ECF No. 132).

These Motions in Limine and Motions for Summary Judgment are now before the Court.

Additionally, two of Pianko's challenges to Magistrate Judge Curtis Ivy, Jr.'s determinations are also before the Court. First, on August 3, 2022, Pianko filed an Appeal of Magistrate Judge Ivy's July 20, 2022 Order on, among other Motions, her May 9, 2022 Motion for Reconsideration (ECF No. 75). (ECF No. 116.) General, Baidas, Davis, and Fowler responded to this Appeal on August 18, 2022 (ECF No. 124), and Pianko replied to this response on August 30, 2022 (ECF No. 130). Second, on January 23, 2023, Pianko filed an Objection to Magistrate Judge Ivy's Report and Recommendation ("R&R") (ECF No. 135) advising the Court to deny her Motion for Default Judgement against Miller. (ECF No. 136.) Miller responded

on February 1, 2023 (ECF No. 137), and Pianko replied on February 6, 2023 (ECF No. 138).

This Opinion and Order will resolve the Motions in Limine in Section III, resolve the Appeal and Objection in Section IV, and address the Motions for (Partial) Summary Judgment in Section V.

### III. Discussion: Motions in Limine

> The Federal Rules of Evidence do[] not explicitly authorize in limine rulings, but the practice was developed pursuant to a district court's inherent authority to manage the course of trials. It is within the district court's discretion to make an in limine ruling on evidentiary matters, but there is no right to an in limine ruling. A motion in limine ruling is nothing more than a preliminary opinion which allows the parties to formulate trial strategy. The trial court is not bound by an in limine ruling and can change its determination during the trial where sufficient facts have developed to warrant the change or even if nothing unexpected happens at trial.

*Aetna, Inc. v. Blue Cross Blue Shield of Mich.*, No. 11-15346, 2015 WL 1646464, at *1 (E.D. Mich. Apr. 14, 2015) (internal citations to *Luce v. United States,* 469 U.S. 38, 41–42 (1984); *Huddleston v. United States,* 485 U.S. 681, 688–89 (1988); and *United States v. Yannott,* 42 F.3d 999, 1097 (6th Cir.1994) omitted).

Pianko argues that General, Baidas, Davis, and Fowler ("Defendants," for the purposes of this Section)'s Motions in Limine are premature because "there is not even a trial date scheduled." (ECF No. 122, PageID 7150; ECF No. 119, PageID 6568–6569.) But the Motions have been fully briefed and the Court finds in its discretion that it is appropriate to decide them now. (The Court recognizes that its rulings will have no effect on those claims that may be dismissed before trial.)

"In analyzing [] motion[s] in limine, the trial court [generally] first considers issues of relevance, admissibility and prejudice." *Aetna, Inc.*, 2015 WL 1646464, at *1. Federal Rule of Evidence 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the

evidence; and (b) the fact is of consequence in determining the action." Federal Rule of Evidence 402 provides that "[i]rrelevant evidence is not admissible."

"The standard for relevance is extremely liberal":

> Evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence is relevant. Even if a district court believes the evidence is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence [as irrelevant] if it has the slightest probative worth.

*United States v. Whittington*, 455 F.3d 736, 738–39 (6th Cir. 2006) (emphasis original) (internal citations and quotation marks omitted).

Still, Federal Rule of Evidence 403 provides that "[t]he Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

For the reasons that follow, the Court will **GRANT IN PART** and **DENY IN PART** Defendants' Motion to Exclude Other Act Evidence (ECF No. 82), **GRANT** Defendants' Motion to Prohibit Evidence as to the EEOC Determination (ECF No. 83), and **HOLD IN ABEYANCE** Defendants' Motion to Exclude Evidence Regarding the Salary and Fringe Benefits of Sales Employees (ECF No. 84).

**A. The Court GRANTS IN PART and DENIES IN PART Defendants' Motion in Limine to Exclude Other Act Evidence (ECF No. 82).**

In their first Motion in Limine, Defendants

> seek to preclude [Pianko] from presenting any documents, testimony, or argument at trial regarding (1) alleged innocuous, stray comments in the workplace not based on sex, (2) General['s] alleged failure to enforce its Non-Fraternization Policy, (3) alleged inappropriate conduct that [Pianko] had no knowledge about during her employment at General [], and (4) certain alleged coworker sexual harassment that is time barred and unrelated to the March 2018 incident.

(ECF No. 82, PageID 3740.) The Court will address each of these requests in turn.

*1. The Court does not preclude the alleged innocuous, stray comments.*

Defendants seek to preclude three specific "stray comments," all of which Pianko overheard: first, Miller introducing himself to a new female employee as "the better looking Miller" (in reference to his brother); and second and third, two occasions in which managers "verbalized their thoughts about attractive female customers" and "unattractive customers." (ECF No. 82, PageID 3750–51) (citing ECF No. 82-2 and ECF No. 82-3, PageID 3838–39). Defendants argue that these comments have no probative value because they "do not implicate Title VII or [the] ELCRA . . . because, taken together, [they] did not subject [Pianko] to harassment 'based on sex,'" given that they are "facially innocuous" and not "lascivious, indicative of anti-female animus, or sexual in nature." (ECF No. 82, PageID 3751–52) (citing *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999); *Wanchik v. Great Lakes Health Plan, Inc.*, 6 F. App'x 252, 264 (6th Cir. 2001); *Oncale v. Sundowner*

35

*Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); and *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001)). Defendants also argue that Pianko "cannot use this evidence to show that General [] somehow tolerated alleged harassment," because she "admittedly failed to complain about these alleged remarks." (ECF No. 82, PageID 3752.)

Alternatively, Defendants contend that, even if these comments had probative value, any such value would be "substantially outweighed by the dangers of unfair prejudice." (ECF No. 82, PageID 3752–53) (citing *Lawson-Brewster v. River Valley Sch. Dist.*, 617 F. Supp. 2d 589, 594–95 (W.D. Mich. 2008) and *Abernathy v. Corinthian Colls., Inc.*, No. 10-cv-131, 2013 WL 12099309 (S.D. Ohio Aug. 5, 2013)).

In her Response to Defendants' Motion, Pianko does not specifically address these three comments, nor many of Defendants' specific arguments. However, she does emphasize that "the rules regarding relevancy are 'quite liberal' in employment cases" to avoid "'crippl[ing] a plaintiff's ability to prove discrimination indirectly and circumstantially by evidentiary rulings that keep out probative evidence because of crabbed notions of relevance.'" (ECF No. 122, PageID 7144) (quoting *Robinson v. Runyon*, 149 F.3d 507, 512–13 (6th Cir. 1989) and also citing *Hamer v. Iowa Civil Rights Comm'n*, 472 N.W.2d 259, 263 (Iowa 1991); *Hollander v. Am. Cyanamid*

36

*Co.*, 895 F.3d 80, 85 (2d Cir. 1990); *Callanan v. Runyun*, 75 F.3d 1293, 1298 (8th Cir. 1996); and *Estes v. Dick Smith Ford, Inc.*, 856 F.2d 1097, 1103 (8th Cir. 1988)).

Pianko also states generally that "the evidence [that she] seeks to introduce . . . is part of the 'totality of the circumstances' a jury must be permitted to consider when deciding, by an objective standard, whether a reasonable employer: (a) would have been aware of a substantial probability that Miller was sexually harassing other women prior to March 4, 2018; and (b) would have imposed consequences for conduct like that of Miller prior to the incident with [Pianko]." (ECF No. 122, PageID 7148) (citing *Chambers v. Trettco, Inc.*, 463 Mich. 297, 319 (2000) and *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 340 (6th Cir. 2008)).

The Court **DENIES** Defendants' Motion for it to preclude these comments. First, the comments are relevant under Federal Rule of Evidence 401 and have probative value under Federal Rule of Evidence 403. Although the comments, even taken together, would not alone create a hostile work environment, they might still contribute to a "totality of circumstances" that does amount to such an environment. These were comments that Pianko heard and that involved either General employees discussing women in sexual terms or making unwanted advances upon female employees. The Sixth Circuit has recognized that "continuous preoccupation with sex talk and persistent unwelcome advances" can create a hostile work environment. *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 456 (6th Cir. 2008). So—even though

37

she relies only Miller's conduct at the hotel in her responses to the pending summary judgment motions, *see* (ECF No. 123, PageID 7161)—Pianko could conceivably integrate these comments into her trial case that she experienced a hostile work environment.

Second, Defendants have not proven that the comments' probative value is substantially outweighed by a danger of unfair prejudice. Indeed, Defendants have not identified what prejudice they are worried about nor explained why any such prejudice would be unfair.

> 2. *The Court precludes* some *evidence of General's alleged failure to enforce its Non-Fraternization Policy.*

Next, Defendants argue that Pianko's "anticipated testimony" that she "overheard gossip about alleged consensual romantic relationships between various employees at General [] in violation of its Non-Fraternization Policy"—specifically, relationships between Miller and "an employee on his desk at the Birch Run location prior to 2006," Miller and Larm, Miller and Kennedy, Miller and Cassidy Lonegrain, Jeremy Miller and Sue Desjardins, Jeremy Miller and Kaitlyn Duyer, Slaughter and Allen, and Slaughter and "Tamara"—should be excluded. (ECF No. 82, PageID 3753–56) (citing ECF No. 82-2). Defendants assert that this testimony "would be inadmissible hearsay." (ECF No. 82, PageID 3754.)

Defendants also contend that "evidence of alleged non-compliance with the Non-Fraternization Policy—which prohibits *consensual* interactions—has no tendency to

make the existence of sexual harassment at General []—which involves *unwelcome* sexual advances—more, or less probable, than it would be without the evidence. (ECF No. 82, PageID 3755.) They aver that "alleged consensual romantic relationships that arise in the workplace do not implicate Title VII as a matter of law." (ECF No. 82, PageID 3755–56) (citing *DeCintio v. Westchester Cnty. Med. Ctr.*, 807 F.3d 304, 308 (2d Cir. 1986) and *Taken v. Okla. Corp. Comm'n*, 125 F.3d 1366, 1370 (10th Cir. 1997)). And they state that, even if this evidence "has some marginal probative value, it is substantially outweighed by the danger of unfair prejudice, namely confusing and misleading the jury to believe that General['s] alleged failure to enforce this policy somehow creates employer liability." (ECF No. 82, PageID 3755.) They characterize "[t]estimony about these alleged relationships" as "nothing more than an attempt to portray General [] and its employees as 'bad' and amoral." (ECF No. 82, PageID 3755.)

Pianko does not specifically address this request, but her general arguments listed above apply to it. *See* Section III.A, *supra*.

The Court **GRANTS** Defendants' Motion for it to preclude Pianko from testifying that she overheard gossip about consensual romantic relationships between employees, because such testimony would introduce "statement[s] that [] the declarant[s] d[id] not make while testifying at the current trial or hearing . . . to prove the truth of the matter[s] asserted in the statement[s]" and therefore would be

hearsay. Federal Rule of Evidence 801(c). "Hearsay is not admissible" unless a federal statute, the Rules of Evidence, or "other rules prescribed by the Supreme Court provide otherwise." Federal Rule of Evidence 802. Pianko has not argued that this testimony falls under any of the hearsay exceptions listed in Federal Rule of Evidence 803 nor that the testimony is admissible for any other reason. So the testimony is inadmissible.

On the other hand, the Court **DENIES** Defendants' Motion for it to preclude under Federal Rules of Evidence 402 or 403 *any* other evidence of General's alleged failure to enforce its Non-Fraternization Policy. It is true that "[a] co-worker's romantic involvement with a supervisor does not by itself create a hostile work environment." *Candelore v. Clark Cnty. Sanitation Dist.*, 975 F.2d 588, 590 (9th Cir. 1992) (citing *Drinkwater v. Union Carbide Corp.,* 904 F.2d 853, 862 (3rd Cir.1990)); *see also DeCintio v. Westchester Cnty. Med. Ctr.*, 807 F.2d 304, 308 (2d Cir. 1986) ("[W]e hold that voluntary, romantic relationships cannot form the basis of a sex discrimination suit under either Title VII or the Equal Pay Act."). But General's failure to enforce its Non-Fraternization Policy could strongly suggest that it similarly failed to enforce its other policies, including its Sexual Harassment Policy. (Indeed, the Non-Fraternization Policy states that its purpose is partly to "prevent unwarranted *sex harassment* claims." (ECF No. 75-2, PageID 2705; ECF No. 96-6, PageID 5984) (emphasis added).) And General's failure to enforce its

Sexual Harassment Policy would be relevant to the question of whether it is culpable for the alleged hostile work environment at issue. *See Wyatt* v. *Nissan N. Am., Inc.*, 999 F.3d 400, 412 (6th Cir. 2021); *Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 685 (6th Cir. 2005).[6]

Even if this probative value is somewhat minimal, it is not clear that it is substantially outweighed by a danger of confusing the jury or creating unfair prejudice. A jury could understand instructions explaining that sexual harassment is different from consensual romantic activity and that General's liability depends (at least in part) upon whether it effectively enforced its Sexual Harassment Policy but not directly upon whether it enforced its Non-Fraternization Policy. And it is unlikely that a jury would be so moved by General's failure to enforce its Non-Fraternization Policy that it would disregard the law and rule for Pianko on a purely emotional basis.

---

[6] The Court assumes here that the supervisor-liability (rather than co-worker liability) framework applies, because there is a genuine dispute of fact as to whether Miller was Pianko's supervisor. *Compare* (ECF No. 121-2, PageID 7044), *and* (ECF No. 87-10, PageID 5164–65), *with* (ECF No. 129-3, PageID 7439), *and* (ECF No. 104-5); *see also Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). The Court will discuss this in further detail when it rules on General's Motion for Summary Judgment on Pianko's sex discrimination claim.

*3. The Court precludes Pianko from using evidence of the alleged inappropriate conduct that she had no knowledge about during her employment at General to prove that she experienced a hostile work environment.*

Defendants state that "[t]he only incidents [that Pianko] knew, or learned of, during her employ [at General] was the Cremer incident and the consensual relationships of [] Miller and [] Slaughter" and she did not know about:

- [T]he alleged comments by Miller pertaining to Alyssa Ruez from a former coworker after [Pianko's] termination . . . in September 2018. . . .

- The alleged exchange of pornographic emails between Miller and other employees at General [].

- The alleged exchange of sexual texts by Miller to other employees.

- An alleged crude comment by Miller at a management meeting at General['s] Birch Run location in February 2009.

- The alleged utilization of crude team names by participants, including Miller, in a fantasy football league.

- Any alleged sexual harassment against [] Kirk.

  . . .

- The complaint of persistent harassment of Shaun Kapp by Donnie MacKinnon at the Wixom store in May 2017.

- Taylor Foote complained that Shawn Little sent her a photograph of a penis in March 2021, after [Pianko] terminated her employment at General.

(ECF No. 82, PageID 3756–58) (first bullet point added). Defendants argue that these alleged incidents "are irrelevant" "[b]ecause [Pianko] had no knowledge of

the[m] during her employment." (ECF No. 82, PageID 3758.) Defendants also argue that those incidents that "involve alleged male-against-male harassment" are "irrelevant" because they do not relate to "whether [Pianko] was harassed based on her female gender" and because these types of harassment are so dissimilar, any probative value would be substantially outweighed by the dangers of unfair prejudice, confusion, and misleading the jury." (ECF No. 82, PageID 3758.)

Pianko offers no specific response to these arguments.

The Court **GRANTS** Defendants' Motion on this issue. Because Pianko did not know about these incidents when she worked at General, she cannot use them to establish that she experienced a hostile work environment there.

However, to the extent that the incidents were reported to or witnessed by General's supervisors and managers (other than the perpetrator), the Court will allow evidence of the incidents and how General responded to them, to shed light on whether General had an effective harassment policy in place at the time that Pianko allegedly experienced a hostile work environment. *See* Section IV.C.2, *infra*; *cf. Faragher v. City of Boca Raton*, 524 U.S. 775, 806 (1998) ("It would [] implement clear statutory policy and complement the Government's Title VII enforcement efforts to recognize the employer's affirmative obligation to prevent violations . . . . Indeed, a theory of vicarious liability for misuse of supervisory power would be at odds with the statutory policy if it failed to provide employers with some such

incentive."); *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 350 (6th Cir. 2005)

("[T]he supervisors at issue here were among those designated to implement the

policy. Consequently, we must consider whether, as implementors of UPS's sexual

harassment policy, the supervisors here acted reasonably—in response to what they

observed—to prevent and correct sexual harassment."). This includes evidence

relating to male-on-male harassment and harassment that occurred after Pianko left

General, because the company's responses to these incidents still provide some

indication as to how effective General's efforts to prevent male-on-female

harassment were leading up to March 3, 2018.

> 4. *The Court precludes Pianko from using evidence of the alleged coworker sexual harassment that Defendants claim is time barred to prove that she experienced a hostile work environment.*

Defendants state that a "charge for sexual harassment in violation of Title VII

must be filed within 300 days" and [t]he statute of limitations for [the] ELCRA

claim[s here] is three years." (ECF No. 82, PageID 3759) (citing 42 U.S.C. § 2000e-

5(d) and MCL § 600.5805(1)); *see also* (42 U.S.C. § 2000e-5(e)). They then note

that "[h]arassing acts that would otherwise be time-barred can be actionable if 'they

are part of the same actionable hostile work environment practice' as non-time

barred harassing acts." (ECF No. 82, PageID 3759) (quoting *Nat'l R.R. Passenger

Corp. v. Morgan*, 536 U.S. 101, 120 (2002)) (internal alteration marks omitted).

"The key inquiry" in the same-actionable-practice analysis, Defendants explain, "is

whether the 'incidents of harassment occurring outside the statutory period are *sufficiently related* to those incidents occurring within the statutory period as to form one continuous hostile work environment.'" (ECF No. 82, PageID 3759) (quoting *Wheaton v. N. Oakland Med. Ctr.*, 130 F. App'x 773, 787 (6th Cir. 2005)) (emphasis Defendants').

Defendants "anticipate that [Pianko] will seek to offer evidence at trial regarding the following . . . incidents:"

- An alleged sexually crude comment by Miller at a management meeting at General['s] Birch Run location in February 2009.

- Miller's alleged consensual romantic relationship with an employee at the Birch Run location prior to 2006.

- Miller's alleged consensual romantic encounter on his desk and in a RV with an employee at the Birch Run location prior to 2006.

- [] Kirk and [] O'Leary filed complaints against each other for harassment at General['s] Birch Run before 2011.

- Alleged harassment of [] Kirk before 2011.

- [Pianko's] complain[t] about [] Crem[a]r . . . and General [] inform[ing] [them] that, in the future, [Cremar] was not to attend any shows with [Pianko].

(ECF No. 82, PageID 3760.) Defendants argue that "each of these alleged incidents is plainly time-barred" and "insufficiently related to the alleged March 2018 incident." (ECF No. 82, PageID 3760.) They also note that "the alleged incident involving Crem[a]r did not involve Miller" and the other "alleged incidents occurred

at a different location—the Birch Run office—and involved either unrelated consensual romantic relationships or incidents [Pianko] did not know about during her employment at General []." (ECF No. 82, PageID 3760–61.)

Pianko does respond to Defendants' time-bar argument. She asserts that "time-barred evidence is permitted to prove pretext or to establish discriminatory motive." (ECF No. 122, PageID 7149) (citing *Cantrell v. Knoxville Cmty. Dev. Corp.*, 60 F.3d 1177, 1181 (6th Cir. 1995); *Clack v. Rock-Tenn Co.*, 304 F. App'x 399, 403 (6th Cir. 2008); and *Gibson v. Shelly Co.*, 314 F. App'x 760, 767 (6th Cir. 2008)). And she contends that the "Court must deny Defendants['] attempt to exclude [this] evidence [from before] the relevant limitations period" because she intends to use it to prove "that General [] did not effectively respond to Miller's misconduct preceding March 4, 2018." (ECF No. 122, PageID 7149–50.) "[A]t trial," she offers, "th[e] Court may deem it appropriate to provide the jury with an instruction to avoid any confusion or prejudice by the introduction of this evidence." (ECF No. 122, PageID 7150.)

The Court **GRANTS** Defendants' Motion and finds, as Defendants request, that Pianko may not rely on any of the above-listed incidents to prove that she was subjected to a hostile work environment. As Defendants note, these incidents are time-barred and not sufficiently related to the incident(s) on which Pianko hinges her case to form one continuous hostile work environment. And Pianko appears to have agreed that she will not use these incidents for this purpose.

But the Court notes that this ruling does *not* preclude Pianko from introducing these incidents for the purpose of demonstrating that General's Sexual Harassment Policy was ineffective. The time-bars cited by Defendants limit the conduct for which General (and the other Defendants) may be held liable, but they do not limit the evidence that the parties can use to support or defeat an affirmative defense, such as General's *Faragher-Ellerth* defense. *See* 42 U.S.C. § 2000e-5(e) ("A charge under this section shall be filed within one hundred and eighty days *after the alleged unlawful employment practice occurred* . . ., except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency . . ., such charge shall be filed by or on behalf of the person aggrieved within three hundred days *after the alleged unlawful employment practice occurred*, or within thirty days *after receiving notice* that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier . . . ." (emphasis added)); M.C.L § 600.5805(1) ("A person shall note bring or maintain an action recover damages for injuries to persons or property unless, *after the claim first accrued* to the plaintiff or to someone through whom the plaintiff claims, the action is commenced within the periods of time prescribed by this section." (emphasis added)).[7]

---

[7] As Pianko suggests, the Court will very likely instruct the jury on the distinction between evidence offered to prove that there was a hostile work environment and evidence offered to prove (or disprove) that General was liable for that environment.

**B. The Court GRANTS Defendants' Motion in Limine to Prohibit Evidence as to the EEOC Determination (ECF No. 83).**

Defendants assert that the "Court should exclude the EEOC Determination—in addition to any comments, exhibits, or testimony regarding it—from evidence at trial for [two] reasons." (ECF No. 83, PageID 4093.) "First," they argue that "the EEOC's opinion has no tendency to make the existence of any fact that is of consequence to the determination of this case . . . more or less probable than it would be without the evidence," because "no deference is owed to a determination by the EEOC." (ECF No. 83, PageID 4093–94) (citing *E.E.O.C. v. Ford Motor Co.*, 98 F.3d 1341 (6th Cir. 1996) (Table) and *Ricker v. Food Lion, Inc.*, 3 F. App'x 227 (2001)). "Second," they argue that "the probative value of this evidence, if any, is substantially outweighed by the palpable dangers of unfair prejudice, confusion, and the needless presentation of cumulative evidence," because "[t]he EEOC Determination would confuse the jury regarding its role at trial, and the jury would likely give the Determination undue weight." (ECF No. 83, PageID 4094–95) (citing *Williams v. Nashville Network*, 132 F.3d 1123, 1129 (6th Cir. 1997) and *Walker v. Daimler Chrysler Corp.*, No. 02-cv-74698, 2005 WL 8154351 (E.D. Mich. 2005)).

In response, Pianko notes that "[t]he admission of EEOC determination letters regarding employment discrimination claims lies within the sound discretion of the trial court." (ECF No. 119, PageID 6563) (citing *Weems v. Ball Metal & Chem. Div., Inc.*, 753 F.2d 527, 528 n.1 (6th Cir. 1985) and *Heard v. Mueller Co.*, 464 F.2d 190,

48

194 (6th Cir. 1972)). She argues that "the EEOC determination is probative of the issues in this case" because it "was based upon two of its trained investigators deposing five (5) key witnesses employed by General [] and thoroughly reviewing additional information submitted by the parties," and "[t]hroughout the whole process, [] General [] was represented by counsel." (ECF No. 119, PageID 6564.) She also argues that the determination is not *unfairly* prejudicial because it "in no way suggests or compels a jury decision based on an improper or an emotional basis." (ECF No. 119, PageID 6564–65) (citing *United States v. Cobb*, 432 F. App'x 578, 586–87 (6th Cir. 2011); *United States v. Castro*, No. 19-cr-20498, 2022 WL 2127954, at *3 (E.D. Mich. June 13, 2022); *Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 515–16 (6th Cir. 1996); and *Robinson*, 149 F.3d at 515).

Further, she observes that many district and circuit courts have held that EEOC determinations are admissible at trial and on summary judgment in federal employment discrimination cases. (ECF No. 119, PageID 6565–70) (citing, among other cases, *DeCorte v. Jordan*, 497 F.3d 433, 440 (5th Cir. 2007); *Barfield v. Orange Cnty.*, 911 F.2d 644, 649–50 (11th Cir. 1990); *Lindsey v. Prive Corp.*, 161 F.3d 886, 894 (5th Cir. 1998)). And lastly, she states that, "[a]t a minimum, the EEOC's probable cause determination should be admitted with a limiting jury instruction." (ECF No. 119, PageID 6567) (citing *Blakely v. City of Clarksville*, 244 F. App'x 681, 683 (6th Cir. 2007); *Cameron v. Laser Vision Inst., L.L.C.*, No. 02-

cv-960, 2006 WL 6849537, at *1–3 (S.D. Ohio Jan. 20, 2006); *Williams*, 132 F.3d
at 1129; and *E.E.O.C. v. Sharp Mfg. Co. of Am.*, No. 06-2611, 2008 WL 189847, at
*1–3 (W.D. Tenn. Jan. 22, 2008)).

Defendants reply that "an EEOC determination is merely its investigator's
opinion on an ultimate legal issue in the case based on credibility determinations and
the weighing of evidence" and thus, if admitted, "would tend to inappropriately
invade the jury's role at trial." (ECF No. 131, PageID 7454) (citing *Mitroff v. Xomox
Corp.*, 797 F.2d 271, 276 (6th Cir. 1986)). They add that "there is no reason to
believe that the EEOC Determination was in fact thorough" and it "cannot be
probative because it was made on a record far more limited than the one here." (ECF
No. 131, PageID 7455.) And they assert that the Determination is more prejudicial
than probative, because Pianko, "through [] puffery . . ., [] seeks to attain the jury's
acquiescence." (ECF No. 131, PageID 7456) (citing *Williams*, 132 F.3d at 1129).

Defendants also state that Pianko relies on "multiple appellate [and district
courts]" . . . that "do not include [and are not in] the Sixth Circuit," and in fact "are
contrary to Sixth Circuit precedent." (ECF No. 131, PageID 7456–57) (citing *Ford
Motor Co.*, 98 F.3d 1341). And finally, Defendants maintain that admission of the
Determination with a cautionary instruction is inadequate because the Sixth Circuit
has not "endorsed" that approach and Pianko "has failed to cogently demonstrate

how [a] limiting instruction would prevent a jury f[ro]m giving undue weight to the Determination." (ECF No. 131, PageID 7457–58.)

The Courts **GRANTS** Defendants' Motion and excludes the EEOC Determination under Federal Rule of Evidence 403.

To begin with, even assuming that the Determination has some relevance under Federal Rule of Evidence 401, its probative value is limited. Indeed, the Sixth Circuit has held—albeit in an unpublished case—that "an EEOC cause determination carries an evidentiary value of practically zero." *Ford Motor Co.*, 98 F.3d 1341 at *10. And the Determination here provides only that "[e]vidence gathered during the [EEOC's] investigation reveals that there is *reasonable cause* to believe that [Pianko's] sexual[] harassment and retaliation charges are true." (ECF No. 119-3, EEOC Determination Letter, PageID 6581) (emphasis added). The Determination does not elaborate on how the EEOC arrived at this conclusion. Nor is it clear how this conclusion—that the EEOC's investigation uncovered "reasonable cause"—should bear on a jury's determination of whether Pianko has proven *to them* by *a preponderance of the evidence* that her sexual harassment and retaliation claims are true.

In contrast, the danger that the jury would find the EEOC Determination confusing and assign it undue weight is significant. The jury may not distinguish between the EEOC's investigation and this case, may not fully appreciate the

difference between "reasonable cause to believe" and a "preponderance of the evidence," and may improperly defer to the EEOC's fact-finding because of its station and expertise. *Cf. Williams*, 132 F.3d at 1129 ("A strong argument can be made that a jury would attach undue weight to this type of agency determination, viewing it as a finding of discrimination . . . rather than as a mere finding of probable cause.").

On balance, then, the Determination's limited probative value is substantially outweighed by the danger that it would confuse the jury or create unfair prejudice. Excluding the Determination safeguards the jury's position as the ultimate fact-finder in this case. *Cf. Goodwill v. Saks Fifth Ave.*, No. 10-14200, 2012 WL 2847593, at *2 (E.D. Mich. July 11, 2012) ("[T]his particular EEOC Determination should not be admitted at trial.").

That said, the Court emphasizes that this ruling does not exclude all of the evidence *gathered* by the EEOC—such as deposition testimony or work reports that the EEOC presumably relied on to make its Determination. That evidence is very likely relevant to Pianko's claims and Defendants have not explained why it would be *unfairly* prejudicial. *Cf. Ricker*, 3 F. App'x at 231 ("Despite refusing to consider the [EEOC cause determination] document itself, the district court nevertheless considered the same evidence presented to the EEOC . . . .") *James v. Quanta Servs., Inc.*, No. 18-11135, 2022 WL 1658843, at *2 (E.D. Mich. May 24, 2022) ("[T]hese

Sixth Circuit[] decisions and the additional cases Plaintiff cites in his motion *in limine* speak specifically to the exclusion of only the EEOC's determinations rather than all evidence from the EEOC file."); *Stokes v. Xerox Corp.*, No. 05-71683, 2008 WL 275672, at *5 (E.D. Mich. Jan. 28, 2008) ("The Court denies Xerox's request to exclude all evidence from Stokes' EEOC investigation file.").

## C. The Court HOLDS IN ABEYANCE Defendants' Motion in Limine to Exclude from Evidence Regarding the Salary and Fringe Benefits of Sales Employees (ECF No. 84).

Defendants "anticipate[] that in support of any request for back-pay and future-pay damages [Pianko] will rely upon the salary and fringe benefit information as to its sales employees." (ECF No. 84, PageID 4290.) But, Defendants argue, "[t]he salary and fringe benefit information of a salesperson is irrelevant to any claim for damages and could confuse the jury," because Pianko was "a Biller" and so "any award of back-pay and future-pay must be determined by the salary of a Biller/Office Assistant." (ECF No. 84, PageID 4290.)

Pianko opposes this Motion on the grounds that she "already performed the job duties of a General [] sales person, had the requisite qualifications to hold the position, and was under consideration up until the time of her termination to become a full time sales person." (ECF No. 120, PageID 7011.)

The Court **ORDERS** bifurcation of the liability and damages phases of this case.

Accordingly, because this Motion relates to damages rather than liability, the Court

**HOLDS** it **IN ABEYANCE** until this case reaches the damages phase.

### IV. Discussion: Challenges to Magistrate Judge Ivy's Determinations

For the reasons that follow, the Court will **GRANT IN PART** and **DENY IN PART** Pianko's Appeal of Magistrate Judge Ivy's July 20, 2022 Order (ECF No. 112) on Motions to Compel (ECF Nos. 64, 73), Motions for Reconsideration (ECF Nos. 68, 75), and Motion for Leave to File Exhibits (ECF No. 103) and **DENY** Pianko's Objection to Magistrate Judge Ivy's January 9, 2023 R&R (ECF No. 135) on her Motion for Default Judgment against Miller (ECF No. 87).

**A. The Court GRANTS IN PART and DENIES IN PART Pianko's Appeal (ECF No. 116) of Magistrate Judge Ivy's July 20, 2022 Order (ECF No. 112) on Motions to Compel (ECF Nos. 64, 73), Motions for Reconsideration (ECF Nos. 68, 75), and Motion for Leave to File Exhibits (ECF No. 103).**

*1. Background*

On August 3, 2022, Pianko filed an Appeal of Magistrate Judge Ivy's July 20, 2022 Order on, among other Motions, her May 9, 2022 Motion for Reconsideration (ECF No. 75). (ECF No. 116.) In this Appeal, Pianko relays the relevant procedural history as follows:

> On April 25, 2022, the magistrate judge issued an order [(ECF No. 67)] containing a clear error of law. The magistrate judge held Miller and Baidas emails containing pornography or misogynistic references <u>while Plaintiff worked at General RV</u> were relevant and discoverable <u>but</u> any Miller and Baidas emails containing pornography or misogynistic referenced "created prior to [Plaintiff's] employment" were not discoverable "because **conduct that happens outside of Plaintiff's presence or of which she did not know during her employment is irrelevant to whether there was a hostile work environment during her employment.**" (ECF No. 112, PageID.6476-

6477(emphasis added). The magistrate judge's ruling contradicts or ignores applicable law and must be reversed. [*Infra* citation omitted.]

On May 9, 2022, Plaintiff timely filed objections, per LR 72.1(d), and sought reconsideration per LR 7.1(h) with the magistrate judge. (ECF No. 75)

On July 20, 2022, the magistrate judge issued an Order finding no "mistake" meriting reconsideration. [Internal footnote omitted.] (ECF No. 112, PageID. 6477)

(ECF No. 116, PageID 6491.) Pianko then requests that the Court "enter an Order:"

A. Modifying ECF No. 112 and directing General [to] produce emails received or sent by Baidas or Miller [*before Pianko's employment at General*] containing pornographic pictures or the keywords, "Hustler", "Gamma Entertainment", "Mile High" and MileHigh"; [and]

B. Modifying ECF No. 112 and directing General [to] produce emails received or sent by Baidas or Miller [*before Pianko's employment at General*] discussing a fantasy sports league or the "wedding crasher" incident.

(ECF No. 116, PageID 6505.) (As Pianko mentions, the Court has already ordered General to produce those emails that contain these keywords or discussions that were sent *during* Pianko's employment at General. *See* (ECF No. 59, PageID 2230–33; ECF No. 124-2, Counsel Discovery Emails.)) Additionally, in her Reply brief, Pianko requests that the Court Order Defendants to "show cause why [it] should not award sanctions to [her]." (ECF No. 130, PageID 7446–47.)

*2. Standards of Review*

As to Magistrate Judge Ivy's ruling on Pianko's Motion for Reconsideration, Local Rule 7.1(h) provides that "[m]otions for reconsideration of non-final orders are disfavored" but "may be brought," "within 14 days after entry of [an] order," "upon the following grounds:"

> (A) The court made a mistake, correcting the mistake changes the outcome of the prior decision, and the mistake was based on the record and law before the court at the time of this prior decision;
>
> (B) An intervening change in controlling law warrants a different outcome; or
>
> (C) New facts warrant a different outcome and the new facts could not have been discovered with reasonable diligence before the prior decision.

As to this Court's review of Magistrate Judge Ivy's Order on Pianko's Motions for Reconsideration,

> 28 U.S.C. § 636(b)(1)(A) and Federal Rule of Civil Procedure 72(a) both provide that a district judge must modify or set aside any portion of a magistrate judge's non-dispositive pretrial order found to be "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). The United States Supreme Court and the Sixth Circuit Court of Appeals have stated that a finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.
>
> This standard plainly does not entitle a reviewing court to reverse the finding of the Magistrate Judge simply because it is convinced that it would have decided the case differently. The Sixth Circuit has noted that: The question is not whether the finding is the best or only conclusion that can be drawn from the evidence, or whether it is the one

which the reviewing court would draw. Rather, the test is whether there is evidence in the record to support the lower court's finding, and whether its construction of that evidence is a reasonable one.

The 'clearly erroneous' standard applies only to the magistrate judge's factual findings; his legal conclusions are reviewed under the plenary 'contrary to law' standard. Therefore, the reviewing court must exercise independent judgment with respect to the magistrate judge's conclusions of law. An order is contrary to law when it fails to apply or misapplies relevant statutes, case law, or rules of procedure.

*Leach v. Balint*, No. 18-11814, 2019 WL 1466292, at *1 (E.D. Mich. Apr. 3, 2019)

(internal quotation marks, alterations, and citations omitted).

### 3. Discussion

First, the Court notes that Pianko has appealed only Magistrate Judge Ivy's July 20, 2022 Denial (ECF No. 112) of her May 9, 2022 Motion (ECF No. 75) for Partial Reconsideration of his April 25, 2022 Order (ECF No. 67) Denying in Part her March 22, 2022 Motion (ECF No. 45) to Compel. Indeed, this is the line of Orders and Motions that Pianko's current Motion refers to in its Procedural Background section. (ECF No. 112, PageID 6489–91.)[8] From there, the Court **DENIES** Pianko's

---

[8] To the extent that Pianko meant to appeal Magistrate Judge Ivy's July 20, 2022 Denial (ECF No. 112) of her April 25, 2022 Motion (ECF No. 68) for Reconsideration of his April 11, 2022 Order (ECF No. 59) Granting in Part her February 18, 2022 Motion (ECF No. 24) to Compel, such appeal would have failed anyway. In the February 18, 2022 Motion to Compel that opened that line of filings, Pianko requested only that the Court "[e]nter an Order compelling [] General [to] produce, within 7 days, the ESI previously agreed to in the Joint Discovery Plan" (and award sanctions). (ECF No. 24, PageID 706.) The Discovery Plan provided that "[c]ounsel for the parties anticipate[d] [that] they w[ould] agree upon date parameters and search terms on or before July 14, 2021." (ECF No. 12, PageID 574.)

request for fantasy football emails, **GRANTS** Pianko's request for the "Wedding Crashers" emails, and **DENIES** Pianko's request for the pornography emails. The Court also **DENIES** Pianko's request for it to Order Defendants to Show Cause why it should not impose sanctions against them.

     i. The Court **DENIES** Pianko's request for fantasy football emails.

In his April 25, 2022 Order on Pianko's March 22, 2022 Motion to Compel, Magistrate Judge Ivy held that the issue of "whether General [] must produce . . . Baidas's 'fantasy football' emails sent or received before May 2014" was "not properly before the Court" because those "emails were the subject of [Pianko]'s first motion to compel against General [], o[n] which the Court heard oral argument,[9]" and "[t]he Court ruled those emails were discoverable, but only those created between May 2014, when [Pianko]'s employment began, and March 2018, when her employment ended." (ECF No. 67, PageID 2603.) In her Motion for Partial Reconsideration of this April 25 Order, Pianko argued that these pre-May 2014

---

But the emails discussing the Plan specifics that the parties have provided to the Court do not set out any clear date parameters. (ECF No. 24-3, PageID 715.) And, at least in connection with her current appeal, Pianko has not produced any other indication of what dates the parties agreed to. Therefore, Pianko has failed to demonstrate that her February 18, 2022 Motion to Compel General's Compliance with the Discovery Plan should entitle her to any emails from before she worked at General.

[9] Pianko has not produced a transcript of this or any other argument that was held before Magistrate Judge Ivy.

fantasy football emails are relevant and discoverable, but she did not address Magistrate Judge Ivy's determination that the issue of their production was not properly before the Court. (ECF No. 75.) So, in his Order denying the Motion for Partial Reconsideration, Magistrate Judge Ivy correctly concluded that the Motion "did not identify a mistake in the Court's determination that this issue was not properly raised and therefore not considered." (ECF No. 112.)

This conclusion was not clearly erroneous nor contrary to law. Pianko's request for fantasy football emails from before her employment is **DENIED**.

ii. The Court **GRANTS** Pianko's request for "Wedding Crashers" emails.

In her March 22, 2022 Motion to Compel, Pianko argued that "[p]roduction of emails containing the key words, 'wedding' 'crashers', and 'Wedding Crashers' and sent to, or received by, Baidas or Miller are relevant to helping prove General [] allowed, encouraged, tolerated, condoned or enabled sexual harassment and had either actual or constructive notice of its existence." (ECF No. 45, PageID 1261) (citing *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999)).[10]

On April 25, 2022, Magistrate Judge Ivy rejected this argument as to any emails that predate Pianko joining General. (ECF No. 67, PageID 2606.) He reasoned that

---

[10] Pianko also argued that "[t]he emails [] will corroborate Lilac's testimony and will discredit Baidas's claim of amnesia about his involvement with Miller and their crashing a wedding together in Mexico." (ECF No. 45, PageID 1261.) But the Court need not consider this second argument because it will grant Pianko her requested relief based on her first argument.

"there ha[d] been no suggestion that P[ianko] was aware of the sexual nature of the wedding crashing incident" and "[w]ithout some connection to P[ianko]'s or other female employees' knowledge during employment, these emails are irrelevant." (ECF No. 67, PageID 2607) (citing *Wanchik*, 6 F. App'x at 262).

Pianko moved for reconsideration, arguing in relevant part that the "emails are probative regarding whether General [] or Baidas knew or should have known of harassment, yet failed to implement prompt and appropriate corrective action." (ECF No. 75, PageIDs 2670, 2675, 2685.) Magistrate Judge Ivy denied the Motion for Reconsideration, reiterating that the emails were "irrelevant [in that] conduct that happens outside of P[ianko]'s presence or of which she did not know during her employment is irrelevant to whether there was a hostile work environment during her employment." (ECF No. 112, PageID 6477.) He noted that "[t]he emails are relevant" to the extent that, "to prove employer liability, [Pianko] must prove the employer tolerated or condoned the offending conduct or that it knew or should have known of the conduct and did not take prompt remedial action," but he maintained that he "limited the timeframe of emails to those created during [Pianko]'s employment for reasons mentioned above." (ECF No. 112, PageID 6477.)

Pianko appealed this decision, repeating the argument listed above, among others (and new arguments). (ECF No. 116.) General, Baidas, Davis, and Fowler responded that "the emails . . . in question . . . would not speak to [] Miller engaging in the same

treatment [Pianko] claims she received in the hotel room that evening" because "[t]here have been no facts set forth to claim that [] Miller engaged in non-consensual sex or attempts of non-consensual sex prior to this incident." (ECF No. 124, PageID 7407.)

The Court finds that the denial of Pianko's Motion for Reconsideration was contrary to law on this point. The April 25 Order made a mistake by ruling that the "Wedding Crashers" emails were not relevant without explicitly considering their relevance to assessing General's employer liability *if* a hostile work environment existed, and the Order denying reconsideration erred by upholding that ruling without sufficiently explaining why the consideration of General's employer liability should not change it. These emails could be relevant if they show that General managers or supervisors witnessed other General employees make "crude or offensive . . . jokes of a . . . sexual nature" and did not report or address the jokes, in violation of General's Sexual Harassment Policy. (ECF No. 75-2, PageID 2704–05; ECF No. 96-6, PageID 5983–84.) Such unpunished violations could suggest that the Policy was ineffective in practice, which is relevant to General's employer liability, *see* Sections III.A.2–3, *supra*. Therefore, and given the "particularly broad" scope of discovery in Title VII discrimination cases, *Goldfaden v. Wyeth Lab'ys, Inc.*, No. 08-10944, 2009 WL 1587360, at *2 (E.D. Mich. June 8, 2009), Pianko's request for the "Wedding Crashers" emails is **GRANTED**. The Court "direct[s]

General [to] produce emails received or sent by Baidas or Miller [*before Pianko's employment at General*] discussing . . . the 'wedding crasher' incident" within fourteen days of the entry of this Opinion and Order.[11] (ECF No. 116, PageID 6505.)

iii. The Court **DENIES** Pianko's request for pornography emails.

Pianko also argued in her March 22 Motion to Compel that "General [] emails for Baidas, Miller and Lilac containing the key words: 'Hustler', 'Gamma Entertainment' 'Mile High' and 'MileHigh'" are "'windows of truth' exemplifying how General [] allowed or tolerated sex harassment" and "refute General['s] and Baidas's 'ostrich defense' that they were unaware of Miller's harassing behavior and misconduct" and "also undercut Miller's credibility and his repeated denials of any sexual harassment or workplace misconduct." (ECF No. 45, PageID 1259.) Specifically, she argued that the emails are relevant because they "will show how often Miller received pornography at work" and "how widespread this conduct was at General." (ECF No. 45, PageID 1263.) And, she argued, they "are also relevant to cross-examine Miller, who denies receiving or viewing pornography of any kind and to bolster the credibility of Lilac, who specifically recalls Miller viewing graphic pornography on his computer screen during the workday." (ECF No. 45, PageID

---

[11] To be clear, the prior Section does not mean that General may exclude any "Wedding Crashers" emails that involve the fantasy football league from this production; it just means that the fantasy football league is not its own basis for an additional production.

1263) (citing ECF No. 45-8, Jan. 27, 2022 Dep. of C. Miller, PageID 1385–86; ECF No. 45-10, D. Lilac Affidavit, PageID1766).

On April 25, 2022, Magistrate Judge Ivy denied these arguments. (ECF No. 67, PageID 2606.) Magistrate Judge Ivy found that emails from before Pianko joined General with these keywords were not relevant because, like the Wedding Crashers emails, they lacked "some connection to [Pianko's] or other female employees' knowledge during employment." (ECF No. 67, PageID 2607.) He elaborated that Pianko had "not cited authority suggesting a manager's private comments or emails, even if disparaging towards the protected group, are relevant to a hostile work environment claim when the plaintiff was unaware of the private comments." (ECF No. 67, PageID 2608.)

Pianko moved for reconsideration, asserting that the emails sent to Miller "are highly relevant and discoverable for multiple reasons such as: (a) showing Miller[] violated General['s] sex harassment policy which forbids 'crude or offensive language' of a 'sexual nature' or displaying 'sexually suggestive' pictures in the workplace; and (b) evidencing General [] and Baidas knew or should have known about Miller's . . . hostile work environment violations and failed to implement prompt and appropriate corrective action." (ECF No. 75, PageID 2676–77) (internal

citation to ECF No. 75-2 omitted).[12] She also reiterated that emails sent to Miller

with these keywords "are discoverable and relevant to cross-examine Miller who

claims not to recall receiving, or viewing, any pornographic pictures sent to him at

his General [] email address" and that "the[] emails [] are discoverable and relevant

to corroborate the testimony of Dan Lilac, a former Gene[ra]l [] salesperson, who

specifically recalls seeing Miller viewing pornography on his General [] computer

screen during working hours." (ECF No. 75, PageID 2682) (citing ECF No. 45-8,

PageID 1384–87 and ECF No. 45-10, PageID 1766).

   Magistrate Judge Ivy denied this Motion for Reconsideration on July 20. (ECF

No. 112.) As noted above, Magistrate Judge Ivy stated that, "to prove employer

liability, [Pianko] must prove the employer tolerated or condoned the offending

---

[12] Similarly, she argued that the emails with these keywords sent to Baidas "are relevant and discoverable for multiple reasons such as: (a) showing Baidas's own violations of General['s] sex harassment policy; and (b) evidencing Baidas's own participation in the objectification of women's bodies, which, when combined with other evidence of anti-woman bias, raise an inference of anti-woman animus which can be imputed to General." (ECF No. 75, PageID 2677) (internal citation to ECF No. 75-2 omitted).

But because Pianko first made these Baidas-specific arguments in her Reply brief to her Motion to Compel, *see* (ECF No. 62), the Court need not consider them. Magistrate Judge Ivy did originally reject Pianko's Reply-brief argument that the emails "will provide 'windows of truth' into Baidas's 'mindset and mental processes'" on the merits, finding that that argument was "connected specifically to the fantasy football emails, not the wedding crashing and pornography emails." (ECF No. 67, PageID 2608) (citing ECF No. 62, PageID 2247–48). Given that Magistrate Judge Ivy was not obligated to even consider that argument, his subsequent refusal to reconsider his rejection of it was not clear error nor contrary to law.

conduct or that it knew or should have known of the conduct and did not take prompt remedial action," but maintained that "the Court limited the timeframe of emails to those created during [Pianko]'s employment for reasons mentioned above." (ECF No. 112, 6477.)

Pianko appealed, reiterating the same arguments listed above (and adding new ones). (ECF No. 116.) General, Davis, Baidas, and Fowler responded, in relevant part, that "the emails between [] Baidas and [] Miller about the terms in question, 'wedding Crasher' and 'Hustler' would not speak to [] Miller engaging in the same treatment [Pianko] claims she received in the hotel room that evening." (ECF No. 124, PageID 7406–07.)

The Court finds that Pianko has not shown that Magistrate Judge Ivy's rejection of her Motion for Reconsideration on this point was clearly erroneous or contrary to law. As Magistrate Judge Ivy recognized, Pianko has not provided any evidence that she ever saw Miller or Baidas receive or view these pornography emails, so the emails have no bearing on whether she experienced a hostile work environment. Nor has Pianko cited any evidence that another member of management ever saw Miller or Baidas receive or view these emails at work or had any other reason to know about them, so the emails have no bearing on General's employer liability either. Further, the Rules of Evidence forbid Pianko from using these emails as "[e]vidence of [Miller's and Baidas'] character[s] or character trait[s] . . . to prove that on a

66

particular occasion [they] acted in accordance with the character[s] or trait[s]." Federal Rule of Evidence 404(a)(1).

Accordingly, Pianko has not shown why these pornography emails (*or* Miller's testimony about them) would be relevant. Thus, Pianko's request for these emails is **DENIED**. This conclusion is only enhanced by the fact that "[l]imited discovery of Miller's General [] emails already uncovered one (1) pornographic picture containing the keywords, 'Hustler', 'Gamma Entertainment', Mile High' and 'MileHigh'." (ECF No. 75, PageID 2682) (citing ECF No. 45-13, PageID 1871–73). To the extent that this email has any probative value and will factor into the case, it is not clear what further probative value older emails would add.

> iv. The Court **DENIES** Pianko's request for it to Order General, Baidas, Davis, and Fowler to show cause as to why they should not be sanctioned.

Finally, as mentioned above, in her Reply to her Appeal, Pianko states that General, Baidas, Davis, and Fowler's Response "argue[s that] '**the relief requested by [Pianko] has been provided**.'" (ECF No. 130, PageID 7446) (citing ECF No. 124, PageID 7400). Then she asks the Court, "[b]ased on this admission," to Order General, Baidas, and Miller to "show cause why this Court should not award sanctions to Pianko, per Fed. R. Civ. P. 11, for [their] not stipulating to the relief requested in this Appeal." (ECF No. 130, PageID 7447.)

This request stems from a misreading of General, Baidas, Davis, and Fowler's Response. These Defendants' alleged "admission" was actually just an

acknowledgment that many emails from *during* Pianko's employment have already been produced. It was not a suggestion that the pre- employment emails at issue here have been or should be discoverable. Pianko's request for an Order regarding sanctions is **DENIED**.

## B. The Court DENIES Pianko's Objection (ECF No. 136) to Magistrate Judge Ivy's January 9, 2023 Report and Recommendation (ECF No. 135) on Pianko's Motion for Default Judgment Against Miller (ECF No. 87).

### 1. Background

On June 24, 2022, Pianko moved for a Default Judgment against Miller, arguing that Miller committed fraud upon the court by lying about his sexual contact with her before March 3, 2018 and about his sexual contact with other General employees. (ECF No. 87.) (Pianko also asked for a Default Judgment against Miller within her Response to Miller's Motion for Partial Summary Judgment. (ECF No. 121, PageID 7038–40.)) On July 7, 2022, Miller responded (ECF No. 97), and on July 19, 2022, Pianko replied (ECF No. 110).

The Court referred Pianko's Motion to Magistrate Judge Ivy for an R&R. (ECF No. 88.) And on January 1, 2023, Judge Ivy recommended that the Court **DENY** the Motion. (ECF No. 135.) Magistrate Judge Ivy reasoned:

> To conclude Miller lied would be to hold that Plaintiff and the testifying witnesses are unquestionably telling the truth and Miller is not. The court is not [in] a position to do so with only competing testimony to rely on. And the court does not make credibility determinations; that is the province of the jury. Plaintiff has raised a question of fact on these

issues, but she has not established by a preponderance of the evidence that Miller acted in bad faith and gave false testimony.

(ECF No. 135, PageID 7611.)

2. *Standard of Review*

Pursuant to Federal Rule of Civil Procedure 72(b), the Court will review "de novo any part of [an R&R] that has been properly objected to." *See also* 28 U.S.C. § 636(c) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.").

"The objections must be clear enough to enable the [Court] to discern those issues that are dispositive and contentious." *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995). Accordingly, "[t]he parties have the duty to pinpoint those portions of the magistrate's report that the district court must specially consider." *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (internal quotation marks and citation omitted); *see also United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981) ("The filing of objections provides the district court with the opportunity to consider the *specific* contentions of the parties and to correct any errors immediately." (Emphasis added)). And "bare disagreement with the conclusions reached by the Magistrate Judge, without any effort to identify any specific errors in the Magistrate Judge's analysis that, if corrected, might warrant a different outcome, is tantamount to an outright failure to lodge objections to the R & R." *Alford v. Butler*, No. 18-cv-10466, 2019

WL 2723670, at *1 (E.D. Mich. July 1, 2019) (internal quotation marks and citation omitted).

*3. Discussion*

On January 23, 2023, Pianko filed an Objection to the R&R. (ECF No. 136.) In this Objection, Pianko argues that "Miller's statements alone prove a stark change of his position clearly designed to manufacture an otherwise nonexistent defense," and therefore, "[c]ontrary to Magistrate [Judge] Ivy's [R&R], no credibility contest involving other witnesses at trial is necessary to recognize, understand, and sanction, Miller for his deceit and gross disregard for this Court and this process." (ECF No. 136, PageID 7620.) She asks that "the Court reject the [R&R] and enter a default judgment against [] Miller" or "[a]lternatively, at a minimum, . . . schedule this serious matter for an evidentiary hearing." (ECF No. 136, PageID 7635.)

Miller responded on February 1, 2023. (ECF No 137.) He maintains that he has been truthful throughout this case. (ECF 137, PageID 7645.) He also asserts that the statements alluded to here "are not central to the issues in this case," and even if he had lied in them, such lying would not have been enough to constitute "fraud upon the Court." (ECF No. 137, PageID 7646–51) (citing, among other cases, *Carter v. Anderson*, 585 F.3d 1007, 1011 (6th Cir. 2009); *Demjanjuk v. Petrovsky*, 10 F.3d 338, 348 (6th Cir. 1993); *Reed-Bey v. Lewis*, No. 20-1394, 2021 WL 1884066, at *2–3 (6th Cir. Mar. 30, 2021); and *Coleman v. Shoney's, Inc.*, No. 99-3134, 2002

WL 1784289, at *2 (W.D. Tenn. July 9, 2002)). He echoes Magistrate Judge Ivy's

concern that Pianko "is asking for an improper credibility determination." (ECF No.

137, PageID 7651–52) (citing *Wyatt*, 999 F.3d at 410). And finally, he states that

Pianko's objection "has no foundation." (ECF No. 137, PageID 7653).

The Court **DENIES** Pianko's Objection and **ADOPTS** Magistrate Judge Ivy's

R&R in full. The Court agrees with Magistrate Judge Ivy that—though Miller has

been inconsistent on the extent of his relationship with Pianko before March 3,

2018—Pianko is asking the Court to make an improper credibility determination as

to Miller's position on what happened on the night of March 3rd. Additionally, in

the Sixth Circuit, "[f]raud on the court consists of conduct" done "on the part of an

officer of the court." *Johnson v. Bell*, 605 F.3d 333, 339 (6th Cir. 2010) (quoting

*Carter v. Anderson*, 585 F.3d 1007, 1011 (6th Cir. 2009)). Miller is not such an

officer.

## V. Discussion: Summary Judgment Motions

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). And a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Still, the non-movant must produce enough evidence to allow a reasonable jury to find in her favor by a preponderance of the evidence. *Anderson*, 477 U.S. at 252. And the Court may only consider evidence that could be presented in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

"The 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Rather, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [her] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). In other words, "'[t]he central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

The Court can now decide a few small summary judgment issues that do not require oral argument. Specifically, the Court will A) **GRANT** Davis' Motion for Summary Judgment in its entirety; B) **GRANT** Baidas and Fowler's Motions for Summary Judgment on all of Pianko's Title VII claims; and C) **GRANT** Miller's Motion for Summary Judgment on Pianko's ELCRA retaliation, tortious

interference, and civil conspiracy claims. The Court will set a Hearing on the remaining issues.

## A. The Court GRANTS Davis' Motion for Summary Judgment in its entirety.

Pianko states in one of her Responses that she "does not oppose dismissal of her claims against . . . Davis." (ECF No. 123, PageID 7172); *see also* (ECF No. 123, PageID 7176) (asking that the Court deny General's, Badias', and Fowler's Motions for Summary Judgment, but not Davis' Motion). For that reason, all of Pianko's claims against Davis are **DISMISSED**. *Cf. Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

## B. The Court GRANTS Baidas and Fowler's Motions for Summary Judgment on all of Pianko's Title VII claims.

Pianko's Amended Complaint appears to assert Title VII claims against the individual defendants. *See* ECF No. 3, PageID 60–63, 66–67 (framing these claims as brought against "General *and its agents*" (emphasis added)). But "an individual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII." *Wathen v. General Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997); *see also Alexander v. Univ. of Memphis*, No. 20-5426, 2021 WL 2579973, at * 3 (6th Cir. June 7, 2021) ("'[A]n individual cannot be held personally liable for violations of Title VII.'" (quoting *Griffin v. Finkbeiner*, 689 F.3d 584, 600

(6th Cir. 2012))). Therefore, Pianko's Title VII claims against Baidas, and Fowler are **DISMISSED**.[13]

### C. The Court GRANTS Miller's Motion for Summary Judgment on Pianko's ELCRA retaliation, tortious interference, and civil conspiracy claims.

Miller asserts that "[t]here is no proof whatsoever that [he] 1) retaliated against [Pianko], [or] 2) had the ability to retaliate against [Pianko]." (ECF No. 104, PageID 6265.) He also argues that "[t]here is no proof whatsoever that [he] interfered or induced a breach or termination of any relationship or expectancy of [Pianko] with anyone." (ECF No. 104, PageID 6266.) And he avers that "[t]here is absolutely no proof that [he] and any of the other Defendants had a common design regarding anything whatsoever to do with" Pianko. (ECF No. 104, PageID 6268.)

Pianko "does <u>not</u> oppose dismissal of her claims against Miller (only) for retaliation under the ELCRA (Count IV), for tortious interference (Count V) or for civil conspiracy (Count VII)." (ECF No. 121, PageID 7019.) So Miller's Motion for Summary Judgment on these claims is **GRANTED**. *Cf. Brown*, 545 F. App'x at 372.

---

[13] Additionally, the Court hereby gives notice to Pianko, pursuant to Federal Rule of Civil Procedure 56(f)(2), that it intends to dismiss her Title VII claims against Miller for the same reason. Pianko may respond to this notice at the Hearing.

**D. The Court sets a Hearing on the remaining summary judgment issues for June 8, 2023 at 9:00 AM.**

The remaining issues are:

1) The Court's notice that it intends to dismiss Pianko's Title VII claims against Miller.

2) General's Motion for Summary Judgment on Pianko's Title VII sex discrimination claim.

3) Miller's Motion for Summary Judgment on Pianko's ELCRA sex discrimination claim.

4) General, Baidas, and Fowler's Motion for Summary Judgment on Pianko's ELCRA sex discrimination claim.

5) General's Motion for Summary Judgment on Pianko's Title VII retaliation claim.

6) General, Baidas, and Fowler's Motion for Summary Judgment on Pianko's ELCRA retaliation claim.

7) Baidas' Motion for Summary Judgment on Pianko's tortious interference claim.

8) General, Baidas, and Fowler's Motion for Summary Judgment on Pianko's conspiracy claim.

At the Hearing, General, Baidas, and Fowler's counsel will have up to five minutes to make an opening statement, then Miller's counsel will have up to five minutes to make an opening statement, and then Pianko's counsel will have up to ten minutes to make an opening statement.

After that, the Court will address the above-listed issues one by one. For each issue, the relevant defense counsel will have up to ten minutes to make their

arguments and answer the Court's questions. Then Pianko's counsel will have up to ten minutes to make his arguments and answer questions. And then the relevant defense counsel will have up to five minutes to reply.

**Conclusion**

For the reasons discussed above, the Court **GRANTS IN PART** and **DENIES IN PART** General, Baidas, Davis, and Fowler's Motion to Exclude Other Act Evidence (ECF No. 82); **GRANTS** General, Baidas, Davis, and Fowler's Motion to Prohibit Evidence as to the EEOC Determination (ECF No. 83); **HOLDS IN ABEYANCE** General, Baidas, Davis, and Fowler's Motion to Exclude Evidence Regarding the Salary and Fringe Benefits of Sales Employees (ECF No. 84); **GRANTS IN PART** and **DENIES IN PART** Pianko's Appeal of Magistrate Judge Ivy's July 20, 2022 Order (ECF No. 112); **DENIES** Pianko's Objection to Magistrate Judge Ivy's January 9, 2023 R&R (ECF No. 135); **GRANTS** Davis' Motion for Summary Judgment in its entirety; **GRANTS** Baidas and Fowler's Motions for Summary Judgment on all of Pianko's Title VII claims; **GRANTS** Miller's Motion for Summary Judgment on Pianko's ELCRA retaliation, tortious interference, and civil conspiracy claims; and **SETS A HEARING** on the remaining summary judgment issues for **June 8, 2023** at **9:00 AM**.

**IT IS SO ORDERED.**


Dated: May 23, 2023

s/Paul D. Borman
Paul D. Borman
United States District Judge