UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MORGAN PIANKO,
                         Plaintiff,

v.

GENERAL R.V. CENTER, INC.;
LOREN BAIDAS; JOY FOWLER;
and CHRISTOPHER MILLER,
                         Defendants.
_____/

Case No. 20-cv-13371

Paul D. Borman
United States District Judge

Curtis Ivy, Jr.
United States Magistrate Judge

**OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART THE REMAINDER OF**
**GENERAL R.V. CENTER, INC.'S MOTION FOR SUMMARY**
**JUDGMENT (ECF NO. 96) AND**
**DENYING THE REMAINDER OF CHRISTOPHER MILLER'S MOTION**
**FOR PARTIAL SUMMARY JUDGMENT (ECF NO. 104)**

On May 23, 2023, this Court entered an Opinion and Order that set out the facts

and procedural history of this case. *See* ECF No. 139, PageID 7703–33.

In that Opinion, the Court also set out the standard for deciding motions for

summary judgment. *See* ECF No. 139, PageID 7773–74. And it granted parts of the

Defendants' Motions for (Partial) Summary Judgment. Specifically, it **GRANTED**

ex-Defendant Christopher Davis' Motion for Summary Judgment in its entirety; B)

**GRANTED** Defendants Loren Baidas and Joy Fowler's Motion for Summary

Judgment on all of Plaintiff Morgan Pianko's Title VII claims; and C) **GRANTED**

Defendant Christopher Miller's Motion for Summary Judgment on Pianko's Elliot-

1

Larsen Civil Rights Act ("ELCRA") retaliation, tortious interference, and civil conspiracy claims. ECF No. 139, PageID 7774–76.

The Court set a Hearing on the remaining summary judgment issues for June 7, 2023. ECF No. 139, PageID 7777. That Hearing was held as scheduled. Now, for the reasons that follow, the Court will D) **DISMISS** Pianko's Title VII claims against Miller; E) **DENY** Defendant General R.V. Center, Inc.'s Motion for Summary Judgment on Pianko's Title VII sex discrimination claim; F) **DENY** General's Motion for Summary Judgment on Pianko's ELCRA sex discrimination claim; G) **DENY** Miller's Motion for Summary Judgment on Pianko's ELCRA sex discrimination claim; H) **GRANT** Baidas and Fowler's Motion for Summary Judgment on Pianko's ELCRA sex discrimination claim; I) **DENY** General's Motion for Summary Judgment on Pianko's Title VII retaliation claim; J) **DENY** General's Motion for Summary Judgment on Pianko's ELCRA retaliation claim; K) **DENY** Baidas' Motion for Summary Judgment on Pianko's ELCRA retaliation claim and **GRANT** Fowler's Motion for Summary Judgment on that claim; L) **DENY** Baidas' Motion for Summary Judgment on Pianko's tortious interference claim; and M) **GRANT** General's Motion for Summary Judgment on Pianko's conspiracy claim and **DENY** Baidas and Fowler's Motion for Summary Judgment on that claim.

**D. The Court DISMISSES Pianko's Title VII claims against Miller.**

The Court noted in its prior Opinion that "'an individual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII.'" (ECF No. 139, PageID 7775) (quoting *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997)). And Pianko agreed at the Hearing to dismiss her Title VII claims against Miller for that reason. So those claims are **DISMISSED** under Federal Rule of Civil Procedure 56(f)(2).

**E. The Court DENIES General's Motion for Summary Judgment on Pianko's Title VII sex discrimination claim.**

Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2. One way for a plaintiff to show that her employer has violated this provision is for her to prove that "'discrimination based on sex has created a hostile or abusive work environment.'" *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008) (quoting *Burnett v. Tyco Corp.,* 203 F.3d 980, 982 (6th Cir. 2000)). "[T]o establish a prima facie hostile-work-environment claim, [the plaintiff] must show: '(1) she was a member of a protected class; (2) she was subjected to unwelcomed harassment; (3) the harassment was based on sex[]; (4) the harassment created a hostile work environment; and (5)

3

employer liability.'" *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 411 (6th Cir. 2021)

(quoting *Ladd v. Grand Trunk W. R.R.*, 552 F.3d 495, 500 (6th Cir. 2009)).

Pianko argues that General violated Title VII's sex discrimination prohibition by

creating a hostile work environment through Miller's conduct on the night of March

3, 2018, at the hotel in Lansing. (ECF No. 123, PageID 7159.) General argues that

Pianko's theory fails to meet the fourth and fifth prima facie case requirements. (ECF

No. 96, PageID 5791–93). For the reasons that follow, the Court, viewing the facts

in the light most favorable to Pianko, finds that a reasonable jury could decide that

Pianko has met these disputed requirements and thus that she has established a

hostile work environment claim.

1.  *A reasonable jury could find that Miller's conduct on the night of March 3rd created a hostile work environment.*

"Harassment creates a hostile work environment when the workplace is

permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently

severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment." *Wyatt*, 999 F.3d at 411 (internal quotation marks,

alterations, and citations omitted). "The existence of a hostile work environment is

evaluated both objectively and subjectively through a totality-of-the-circumstances

approach": "The conduct must be so extreme that a reasonable person would find

the working environment to be abusive, and the plaintiff must subjectively perceive

that the conduct at issue has altered the terms and conditions of her employment."

*Marotta v. Ford Motor Co.*, 119 F. Supp. 3d 676, 690–91 (E.D. Mich. 2015) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)).

"Several circumstances are to be considered in determining whether an environment is 'hostile' or 'abusive,' which 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Burnett*, 203 F.3d at 982–83 (quoting *Harris*, 510 U.S. at 23).

While "generally a single incident of sexual harassment will not create a hostile work environment," a "very severe single incident can be sufficient" to do so. *Radtke v. Everett*, 442 Mich. 368, 394 n.40 (1993) (citing, among other cases, *Vermett v. Hough*, 627 F. Supp. 587, 605–06 (W.D. Mich. 1986)); *see also Hickman v. Laskodi*, 45 F. App'x 451, 454 (6th Cir. 2002) ("An isolated incident of harassment, if 'extremely serious,' is sufficient to create a hostile work environment."). For example, in *Ault*, the Sixth Circuit held that a reasonable jury could find that the single incident of the plaintiff's manager "press[ing]" his penis against her, "position[ing] himself in a way that prevented her from moving to escape," and "fail[ing] to relent, despite repeated requests," "by itself . . . created a hostile work environment." *Ault v. Oberlin Coll.*, 620 F. App'x 395, 403 (6th Cir. 2015) (interpreting an Ohio sexual harassment law by "look[ing] to federal case law

interpreting Title VII in addition to the state courts' own precedents"). Similarly, in *Radtke*, the Michigan Supreme Court held that a reasonable jury could find that the plaintiff's supervisor created a hostile work environment by "physically restrain[ing]" her and "attempt[ing] to force her to kiss him." *Radtke*, 442 Mich. at 384–85, 395–96 (interpreting the ELCRA with "guidance" from federal Title VII precedent).

### *Arguments*

General argues that "the incident at the bar is not severe or pervasive enough to" establish a hostile work environment. (ECF No. 96, PageID 5792.) Distinguishing the facts here from those in *Radtke*, General states that "Miller was not [Pianko]'s supervisor, she would not have to report any sexual harassment to him and in fact she did not report any sexual harassment to him but rather to . . . Fowler." (ECF No. 96, PageID 5792.) General also asserts that Pianko "voluntarily followed [Miller] to his room," that Miller "let [Pianko] go after she requested [to] leave the room," and that Pianko has not alleged that Miller "touch[ed] any [] part of her body" other than her wrist, nor that he "threaten[ed] her or force[d] sex upon her." (ECF No. 96, PageID 5792.)[1]

---

[1] General also argues that other workplace conduct could not have created a hostile work environment either. (ECF No. 96, PageID 5788–91.) But the Court need not address this argument, because, as alluded to above, Pianko's briefing relies only on the hotel incident.

Further, General contends that Miller's conduct at the hotel cannot form the basis of a hostile work environment claim because it occurred "after [work] hours" and Miller and Pianko "did not work together." (ECF No. 96, PageID 5795–97) (citing *Duggins v. Steak'N Shake, Inc.*, 3 F. App'x 302 (6th Cir. 2001); *Hawkins*, 517 F.3d. at 335; *Burlington N. & Santa Fe R.R. v. White*, 548 U.S. 53, 126 (2006); and *Temparali v. Rubin*, No. 96-5382, 1997 WL 361019 (E.D. Pa. 1997)). It adds that, "[f]or [] off-work harassment to be considered it must be an 'episode in a relationship that began and grew in the workplace.'" (ECF No. 96, PageID 5796) (quoting *Doe v. Oberweis Dairy*, 456 F.3d 704, 716 (7th Cir. 2006)).

Pianko responds that "Miller's attempted sexual assault, coupled with his exposing his intimate body parts, then violently grabbing [Pianko] as she tried to escape, is actionable sex harassment." (ECF No. 123, PageID 7161) (citing *Wyatt*, 999 F.3d at 409, 411 and *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1993)). She notes that "[t]he 6th Circuit repeatedly has held that a single, extremely serious incident may give rise to a hostile work environment under Title VII." (ECF No. 123, PageID 7159) (citing *Ault*, 620 F. App'x at 402 and *Hickman*, 45 F. App'x at 454–55). And she adds that Miller's "power and authority," as her "supervisor at the March 2018 RV show" and as the supervisor of "the entire sales department [she] sought to join," "enhanced the severity of his misconduct." (ECF No. 123, PageID

7162–63) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998) and

*Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)).

General replies that the incident here "does not rise to the level of conduct as set

forth in *Radke*, nor is it akin to the conduct in the cases relied upon by [Pianko]."

(ECF No. 129, PageID 7428.) General argues that this case is distinct from *Hickman*

because "[t]here is no allegation that [] Miller made a threat of physical harm

towards [Pianko]"; that it is distinct from *Ault* because "Miller was not [Pianko]'s

supervisor, he did not press his genitals against her, and [he] released her arm so she

could leave"; and that it is distinct from *Wyatt* because it involves a single incident

rather than an ongoing and "continued physical invasion." (ECF No. 129, PageID

7428–29.)

*Analysis*

A reasonable jury could find that Miller's alleged conduct in the hotel room was

subjectively and objectively severe enough to create a hostile work environment. On

the subjective element, Pianko has repeatedly stated that Miller's conduct caused her

to feel unsafe at work. *See* ECF No. 3-5, PageID 82–83; ECF No. 121-2, PageID

7048; ECF No. 121-9, PageID 7135.

On the objective element, a reasonable person in Pianko's position would have

also found the environment to be abusive. Much like the plaintiffs in *Ault* and

*Radtke*, Pianko states that she was faced with an upper-level manager—who may

8

have had the power to fire her, *see* Section E.2.i, *infra*—touching her, trying to coerce her into performing sexual conduct, and, for at least a short time, physically preventing her from leaving. (ECF No. 121-2, PageID 7044–47.) Furthermore, this manager continued to pursue her for sex via text message after 2:00 AM. *See* ECF No. 3-2.[2] This is enough to create a genuine dispute as to whether Miller created a hostile work environment.

General's remaining arguments to the contrary are unavailing. The fact that Pianko "voluntarily followed [Miller] to his room" before this all occurred is inapposite. And the fact that the harassing conduct occurred outside of the office does not defeat Pianko's claim either. Unlike in *Duggins* and *Temparali*, the conduct here did not occur at a purely private party with no connection to the workplace, and the perpetrator was not just a nominal co-worker with whom Pianko rarely or never worked. *Cf. Duggins*, 3. F. App'x at 311; *Temparali*, 1997 WL 361019 at *1–3. Instead, Miller harassed Pianko on an overnight *business trip*, in a hotel that General had designated for its employees, (ECF No. 96-3, PageID 5894[3]); Miller was

---

[2] Specifically, Miller texted Pianko, at 2:20 AM, "Was wondering if you wanted me to come see you." She responded, "I need to sleep. Gotta be on my A game for work. We will talk tomorrow." He replied, "You would sleep better with me there." And even after he acknowledged that she wanted to "keep things professional," he asked again, "Don't want to see me?" (ECF No. 3-2, PageID 76–77.)

[3] At this page of her deposition, Pianko agrees that the General employees "were all staying at a local hotel [] in Lansing." General confirmed at the Hearing that it arranged for this lodging.

(possibly) Pianko's supervisor, in a broad sense, Section E.2.i, *infra*; and the two had interacted at work before the trip, including by discussing Pianko's career aspirations, and also saw each other at work after it, (ECF No. 96-3, PageID 5860–62, 5907; ECF No. 121-2, PageID 7043–7044). Under those circumstances, a reasonable jury could find that Miller's conduct was sufficiently connected to Pianko's employment to alter her working conditions. *Cf. Wyatt*, 999 F.3d at 408–12 (holding that the plaintiff's (alleged) supervisor contributed to the creation of a hostile work environment by, after going out to lunch with the plaintiff, stopping at a hotel on the way back and "sexually propositioning her and exposing his genitals to her"); *Moring v. Arkansas Dep't of Corr.*, 243 F.3d 452, 456–57 (8th Cir. 2001) (holding that a reasonable jury could find that an incident in a hotel on an "overnight business trip"—in which the plaintiff's supervisor entered her room "clothed only in boxer shorts," "insisted that [she] 'owed' him for her job," ignored her repeated requests for him to leave, and "touched her thigh and leaned in to kiss her"—"was severe enough to alter the terms and conditions of [the plaintiff's] employment"); *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 135 n.2 (2d Cir. 2001) (recognizing "cases that have found or implied that sexually abusive conduct *committed by supervisors* away from the place of employment can sustain employer liability" for a hostile work environment); *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261–63 (10th Cir. 1998) (considering a supervisor's conduct while travelling

on business trips with his employees as relevant to the determination of whether he created a hostile work environment).

2. *A reasonable jury could find that General is liable for the hostile work environment created by Miller.*

"Under Title VII, an employer's liability for [sexual] harassment may depend on the status of the harasser. If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a 'supervisor,' however, different rules apply." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). So the first question is whether Miller was Pianko's supervisor. Based on the record before the Court, a reasonable jury could find that he was. And from there, a reasonable jury could go on to find that General was liable for his conduct.

i. A reasonable jury could find that Miller was Pianko's supervisor.

"[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim . . . ." *Vance*, 570 U.S. at 424. "Tangible employment actions" are actions that "effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* at 431 (quoting *Ellerth*, 524 U.S. at 761).

*Arguments*

General argues that Miller "was not [Pianko]'s Manager and had no authority to hire, fire, or discipline [her] as a Biller." (ECF No. 96, PageID 5793.) Rather, General asserts, "Miller was a corporate sales manager and . . . would supervise the store sales managers, only." (ECF No. 96, PageID 5793) (citing ECF No. 96-13). General also points out that "Baidas [] attested in his affidavit that [] Miller did not have the authority to hire, fire, or discipline [Pianko]." (ECF No. 96, PageID 5793) (citing ECF No. 96-13).

Pianko responds that, "[a]t RV shows, Miller was one of [her] immediate supervisors." (ECF No. 121, PageID 7028[4]; ECF No. 123, PageID 7163) (citing ECF No. 104-3, PageID 6392–93 and ECF No. 121-2). She emphasizes that Jill Peelman and Kayla Allen, both General Finance Managers, testified to this fact. (ECF No. 121, PageID 7028–29) (citing ECF No. 87-10, PageID 5164 and ECF No. 121-6). And she avers that "Miller had the authority to recommend to his sales managers (including his younger brother) who they should hire as a sales person," a position in which Pianko was interested. (ECF No. 121, PageID 7030) (citing ECF No. 121-2 and EEOC Enforcement Guidance: Vicarious Liability for Unlawful Harassment

---

[4] General objects to Pianko citing her brief in Response to Miller's Motion for Partial Summary Judgment within her brief in Response to its own Motion for Summary Judgment. But General does not point to any rule or custom that prohibits Pianko from doing that.

by Supervisors (June 18, 1999), https://www.eeoc.gov/laws/guidance/enforcement-guidance-vicarious-liability-unlawful-harassment-supervisors   [https://perma.cc/3ZQL-XHPE]).

General replies that it "has provided evidence, through the Affidavit of [] Baidas that [] Miller was not the supervisor of [Pianko]" (ECF No. 129, PageID 7429) (internal citation to ECF No. 129-3 omitted). And it claims that Pianko "has failed to produce any evidence that [] Miller was her supervisor." (ECF No. 129, PageID 7430.)

### *Analysis*

Despite General's claim to the contrary, Pianko has supplied enough evidence to create a genuine dispute of fact as to whether Miller was her supervisor. Although Pianko did not know at her deposition whether Miller had the power to fire or reassign her, (ECF No. 104-3, PageID 6394–95), she swore in a subsequent affidavit[5] that, at least when they were at RV shows, which they both attended occasionally, Miller "had the power and authority to . . . remove [Pianko] from [her]

---

[5] *Miller* (not General) argues that the Court should not consider this Affidavit because it directly contradicts Pianko's deposition testimony. (ECF No. 132, PageID 7466.) But the Court disagrees with that characterization. At her deposition, Pianko testified that she was not sure whether Miller was her supervisor at RV shows—not that he certainly was *not* her supervisor at them. *See* ECF No. 96-3, PageID 5929–31. Pianko may have refreshed her memory or gained further information on the issue in between her deposition and when she signed her Affidavit. Further, whether any inconsistency on this point renders Pianko's Affidavit unreliable is a question for the jury.

job if [she] was not acting in a professional manner" and "also had the authority to direct [her] on what to do or how to do it," (ECF No. 121-2, PageID 7044). Additionally, Peelman confirmed this statement, testifying that Miller was Pianko's "sales manager" at RV shows and that he had the power to fire her at them. (ECF No. 87-10, PageID 5164–65.)

To be sure, Baidas disagrees, stating in his affidavit that "Miller did *not* have any authority to hire, fire or discipline [] Pianko." (ECF No. 129-3, PageID 7439) (emphasis added). And Miller states basically the same thing in his affidavit. (ECF No. 104-5). But General does not explain why every reasonable jury would credit Baidas and Miller's affidavits over Pianko's affidavit and Peelman's deposition testimony, nor does it cite to any other evidence to support Baidas and Miller's position.

Accordingly, the Court will consider whether General could be liable for sex discrimination if Miller was Pianko's supervisor.[6]

    ii.  If Miller was Pianko's supervisor at the Lansing show, then a reasonable jury could find that General is liable for the allegedly hostile work environment that Miller created.

"If [a] supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if the harassment does not result in a tangible

---

[6] The Court will not discuss whether General could be liable if Miller was Pianko's co-employee rather than her supervisor, because the supervisor-liability analysis is enough to defeat General's Motion for Summary Judgment on this issue.

employment action, the employer may escape [its presumptive] liability by establishing an affirmative defense under the *Faragher-Ellerth* framework." *Wyatt*, 999 F.3d at 412 (internal citations and quotation marks omitted) (referring to a defense set out in *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) and *Ellerth*, 524 U.S. at 765). To establish this affirmative defense, the employer "must show that (1) it exercised reasonable care to prevent and correct any harassing behavior *and* (2) [] [the plaintiff-employee] unreasonably failed to take advantage of the preventative or corrective opportunities that [the employer] provides." *Id.* at 414 (emphasis added). The employer "loses the [] defense if it fails either prong." *Id.*

Because Pianko does not argue that Miller's harassment directly culminated in a tangible employment action,[7] the Court must consider whether General has established a *Faragher/Ellerth* defense. The Court finds that General's attempt to do so fails on the first prong.

---

[7] Even if Pianko had brought a constructive discharge claim, General would likely still have been entitled to assert a *Faragher/Ellerth* defense. *See Chapman v. Carmike Cinemas*, 307 F. App'x 164, 169 (10th Cir. 2009) ("The Supreme Court has determined . . . that when 'an official act does not underlie the constructive discharge,' the employer may invoke the *Ellerth/Faragher* affirmative defense." (quoting *Penn. State Police v. Suders,* 542 U.S. 129, 148 (2004))).

a. A reasonable jury could find that General did not exercise reasonable care to prevent and correct harassing behavior.

Generally, employers exercise reasonable care to *prevent* harassing behavior when they "disseminate" and "publicize" a "'reasonable sexual harassment policy'" that is "'effective in practice.'" *Wyatt*, 999 F.3d at 413–14 (quoting *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 349–50 (6th Cir. 2005)); *Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 685 (6th Cir. 2005). "An effective policy should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for training regarding the policy." *Clark*, 400 F.3d at 349–50 (internal citations omitted).

Employers exercise reasonable care to *correct* harassing behavior when they respond to such behavior in a way that "is reasonably calculated to end the harassment." *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999). "[T]he appropriateness of a response" depends on "the frequency and severity of the alleged harassment" and the evidence substantiating that it occurred. *Id.*; *Barna v. City of Cleveland*, 172 F.3d 47, at *4 (6th Cir. 1998) (Table).

**Arguments**

General argues that "[i]t is uncontested that after Plaintiff's complaint of this incident on March 9, 2018, [General] took prompt action. [] Baidas met with [Pianko] and investigated her story and immediately placed [] Miller on suspension

during this investigation and after the investigation was concluded [] Miller was disciplined." (ECF No. 96, PageID 5794) (citing ECF No. 96-10). General further argues that the discipline "was appropriate to ensure that [Pianko] would not endure any like conduct by [] Miller in the future." (ECF No. 96, PageID 5794) (adding (among other things) that in *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48 (6th Cir. 1996) the Sixth Court "found that a reprimand which stopped the harassment was sufficient").

Pianko responds that, "[p]rior to March 4, 2018, there were several red flags that warned (or should have warned) General about Miller's sexually harassing misconduct." (ECF No. 121, PageID 7035.) She argues that "[t]hese warnings include[d]:"

- Miller preying upon, and engaging in sexual relationships with, <u>multiple lower level employees</u> (including, without limitation, Ariel Larm, Samantha Wells, April McCormick and Erin Kennedy) in blatant violation of General RV's anti-fraternization policy.

- Miller sexually harassing Melinda Kirk, who . . . reported Miller's misconduct to no avail to multiple General RV supervisors (Bob Green, Scott Dodge and Larry Peter) . . . [T]here was no investigation and no discipline for Miller. . . .

- Miller using General RV's work place for sexual encounters and assaults of General RV employees, including engaging in sexual relationships with a female employee <u>on his work desk</u> and <u>in a new RV for sale on the showroom floor</u> and, on at least one occasion grabbing and forcibly kissing a General RV employee in an RV without her consent.

- Miller using General RV's computers to view pornography during the workday in violation of General RV's internet use policy . . . .

- Miller . . . loudly boasting of his sexual conquests during General RV team dinner meetings at RV shows, which included high-level senior managers . . . . His "bravado" included "locker room" comments like "I'm going to get laid tonight" . . . . There was also "underground talk" about Miller's sexual exploits with various other General RV women. Yet none of these General RV executives ever bothered to stop or investigate Miller, even though such "off duty" sexual relationships were "strictly prohibited" by General RV.

- Miller participating in fantasy sports leagues with other male General RV employees and managers using an offensive, misogynistic team name "Stick It In Her Buchholz", while other General RV managers and employees chose other offensive, misogynistic team names . . . in direct violation of General RV's handbook which requires its employees to treat "their fellow employees, customers and others with respect" and prohibits "crude or offensive languages or jokes" of a "sexual nature" in the workplace.

- Miller making offensive, sexual remarks to other employees and sales staff about women's genitalia and breasts. This includes a crude "pink taco" (slang for a woman's genitalia) comment during a sales meeting (that was reported and resulted in General RV warning Miller not to do it again); and [] repeatedly telling a lewd "knock knock" joke about women's breasts . . ., including a coworker's breasts.

(ECF No. 121, PageID 7035–37) (internal footnotes and citations omitted).

She adds that "Miller and Baidas also shared a fantasy sports team they named "Wedding Crashers" in an attempt to glorify [the] event in Mexico where Miller and Baidas crashed a wedding reception together and sparked a fistfight after Miller told an obscene joke to a female wedding guest about her breasts. . . ." (ECF No. 121,

PageID 7037) (citing ECF No. 45-8, PageID 1496). She observes that "Miller received no discipline" for this "misconduct at [a] work event with multiple General [] employees and managers present, including Baidas." (ECF No. 121, PageID 7037.)

From there, Pianko argues that, "[b]ased on the totality of the circumstances, by an objective standard, a reasonable employer would have been aware of a substantial probability that Miller was sexually harassing other women prior to March 4, 2018." (ECF No. 121, PageID 7037) (citing *Chambers v. Trettco, Inc.*, 463 Mich. 297, 319 (2000)). She asserts that "[i]t is General[]'s burden to persuade a jury to buy its 'ostrich defense' that, before Plaintiff reported Miller in March 2018, General [] did not know Miller was a serial harasser and was oblivious to his misconduct." (ECF No. 121, PageID 7037.) "At a minimum," she states, "this evidence shows [] General[]'s 'manifest indifference or unreasonableness in light of the facts [it] knew or should have known.'" (ECF No. 121, PageID 7037–38) (quoting *Hawkins*, 517 F.3d at 340).

General replies that "[t]he 'other acts' relied upon d[id] not place [] General [] on notice of a hostile work environment, as fully set forth in [General]'s . . . Motion in *Limine*." (ECF No. 129, PageID 7430) (citing ECF No. 82); *see also* ECF No. 139, PageID 7736–48. It further contends that Pianko "fails to address the fact [that] immediately after the complaint was lodged [General] took prompt and remedial

action and [Pianko] failed to take advantage of the corrective action." (ECF No. 129, PageID 7430.)

### Analysis

A reasonable jury could find that General failed to exercise reasonable care to prevent the harassment endured by Pianko. Even assuming that General disseminated a facially sufficient sexual harassment policy,[8] there is still a genuine dispute as to whether that policy was effective in practice.

General's management could not be responsible for failing to respond to those "warnings" listed by Pianko of which it was not, and should not reasonably have been, aware. But not all of Pianko's warnings fall into that category. General's management knew about some of Miller's improper conduct and arguably failed to respond appropriately to it.

Most importantly, Pianko has provided evidence that General failed to respond in any way to Miller's alleged mistreatment of Kirk, which occurred some time between 2006 and 2011. Kirk swears that she "reported" and "filed a written complaint about" Miller (among other things) forcibly kissing her at work and yet General "did nothing to stop [] Miller from harassing [her,]" or, by extension, others.

---

[8] Neither party has addressed this point, but the record suggests that General's Sexual Harassment Policy was adequate as written and that General provided harassment training to go along with it. *See* ECF No. 96-6, PageID 5983–84; ECF No. 96-15, PageID 6122; ECF No. 123-4, PageID 7225; 123-5, PageID 7322.

(ECF No. 38-3, PageID 884–885.) Although General insisted at the Hearing that the Court should ignore Kirk's testimony because it has not found any record of her complaint, General has not identified any evidence that conclusively *disproves* Kirk's account. And even though this incident occurred at least seven years before Miller allegedly harassed Pianko, it remains relevant, because it involved the same harasser, and because General has not suggested that it appreciably strengthened its Sexual Harassment Policy or heightened its scrutiny of Miller during the intervening years.

Pianko has evidence that General's management failed to respond to other incidents too. For example, Baidas saw Miller get into a physical fight over a joke about a woman's breasts at a wedding in Mexico. (ECF No. 38-4, PageID 888; ECF No. 38-8, PageID 1075–76.) But there is no evidence that anyone at General disciplined Miller for that incident or even reprimanded him for it. To the contrary, Baidas arguably glorified the event by joining Miller's fantasy football team named "Wedding Crashers." (ECF No. 38-4, PageID 888.) And while the wedding and the football team were not sponsored by or directly related to General, both had some connection to the company: Baidas and Miller were in Mexico for a sales trip, and Miller used his General email for the football league, which included multiple General employees.

A reasonable jury could find that General's failure to substantively address this prior conduct—by disciplining, monitoring, or further training Miller—demonstrates that its sexual harassment prevention efforts were ineffective and it failed to discharge its "affirmative duty to prevent sexual harassment by supervisors." *Clark,* 400 F.3d at 349; *cf. Collette*, 126 F. App'x t 686 ("The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified."); *Shields v. Fed. Exp. Customer Info. Servs. Inc.*, 499 F. App'x 473, 479–80 (6th Cir. 2012) ("Even if the company determined that there was insufficient evidence to sustain Hocker's charge of sexual harassment, that does not mean that it had no responsibility to take other remedial steps to ensure that [Klingenberg] did not harass other women." (internal quotation and alteration marks omitted)).

That General issued a Warning to Miller after Burton reported his "pink taco" joke does not change this conclusion. General's Warning was a step in the right direction, but it does not conclusively outweigh General's failure to address the issues discussed above. Moreover, the "pink taco" report should have made General *more* inclined to monitor Miller and respond forcefully to any further misconduct. *See Hawkins*, 517 F.3d at 341 ("An employer's responsibility to prevent future harassment is heightened where it is dealing with a known serial harasser and is

therefore on clear notice that the same employee has engaged in inappropriate behavior in the past.").

Therefore, General has failed to establish a *Faragher/Ellerth* defense at this stage. General's Motion for Summary Judgment on Pianko's Title VII sex discrimination claim is **DENIED**.

## F. The Court DENIES General's Motion for Summary Judgment on Pianko's ELCRA sex discrimination claim.

Much like Title VII, the ELCRA makes it unlawful for "[a]n employer" to "discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . sex." M.C.L. § 37.2202(1). It specifies that "[d]iscrimination because of sex includes sexual harassment." M.C.L. § 37.2103(i). And it explains that: "[s]exual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under" any of three conditions, one of which is that "[t]he conduct or communication has the purpose or effect of substantially interfering with an individuals' employment . . . or creating an intimidating, hostile, or offensive employment . . . environment." *Id.*

General contends that for Pianko to prevail on her ELCRA claim against it, she must meet the Title VII requirements set out above and *also* show "'that the conduct or communication [at issue] was actually sexual in nature (not simply based on gender) as well as respondeat superior.'" (ECF No. 96, PageID 5786) (quoting

23

*Marotta*, 119 F. Supp. 3d at 688). But General does not make any specific arguments as to these additional ELCRA requirements.

Accordingly, for the same reasons that General's Motion for Summary Judgment on Pianko's Title VII sex discrimination claim fails, and because Miller's alleged conduct on March 3rd was self-evidently "sexual in nature," General's Motion for Summary Judgment on Pianko's ELCRA sex discrimination claim is **DENIED**.

## G. The Court DENIES Miller's Motion for Summary Judgment on Pianko's ELCRA sex discrimination claim.

The ELCRA also provides that, for its purposes, "'[e]mployer' means a person who has 1 or more employees, *and includes an agent of that person*." M.C.L. § 37.2201(a) (emphasis added). In *Elezovic*, the Michigan Supreme Court held that this definition "create[s] individual liability for an employer's agent" who violates the statute. *Elezovic v. Ford Motor Co.*, 472 Mich. 408, 419–26 (2005).

When *Elezovic* was returned to the Michigan Court of Appeals, that intermediate court explained that "'agents' . . . for purposes of the [EL]CRA" are "persons to whom an employing entity delegates supervisory power and authority to act on its behalf." *Elezovic v. Bennett*, 274 Mich. App. 1, 10 (2007). The Court of Appeals further clarified that "[t]he issue is not whether the harassing acts were within the scope of the agent's authority . . . . The issue is whether the harasser was an agent, one vested with supervisory power and authority, at the time the harassing acts were being perpetrated against the victim." *Id.* at 11. In other words, the Court concluded,

24

"[a]n agent can be held directly and individually liable if he engaged in discriminatory behavior in violation of the [EL]CRA while acting in his capacity as the victim's employer." *Id.* at 15.

### Arguments

Miller argues that he is not liable for discrimination against Pianko under the ELCRA because he did not discriminate against her "'while acting in his capacity as [her] employer.'" (ECF No. 104, PageID 6260) (quoting *Elezovic*, 274 Mich. App. at 15 and also citing *Sicuso v. Carrington Golf Club, LLC*, No. 17-13938, 2019 WL 296703 (E.D. Mich. Jan. 23, 2019) and *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428 (6th Cir. 2012)). Miller asserts that he was not acting as Pianko's employer at the hotel on the night of March 3rd because he was never her supervisor, (ECF No. 104, PageID 6260–62) (citing ECF Nos. 104-3–5); *see also* (ECF No. 132, PageID 7464–66), and because "the incident . . . occurred after work," (ECF No. 104, PageID 6262).

In response, Pianko argues that Miller was her supervisor, (ECF No. 121, PageID 7028–30) (citing ECF No. 121-2 and ECF No. 87-10), and that "[t]he timing and location of the assault and harassment is irrelevant to holding Miller responsible under the ELCRA," (ECF No. 121, PageID 7031) (citing *Elezovic*, 274 Mich. App. 1).

*Analysis*

For the reasons stated above, a reasonable jury could conclude that Miller's conduct on the night of March 3rd was sex discrimination. *See* Section E.1, *supra*. A reasonable jury could also conclude that Miller was Pianko's supervisor, and thus that he was an agent of General. *See* Section E.2.i, *supra*.

The remaining question is whether Miller was such an agent *at the time* when he allegedly harassed Pianko. There is at least a question of fact on this point. *Cf. Miller v. Herskovic*, No. 263250, 2006 WL 3498422, at *14 (Mich. Ct. App. Dec. 5, 2006) (holding that "a question of fact exist[ed] regarding whether [someone] was an agent of [a] firm when he made [certain] representations"). Although they were not at the office or at the actual RV show when Miller harassed Pianko, they were, as previously noted, not completely disconnected from work either. *See* Section E.1, *supra*. They were at a hotel designated for those General employees who were in Lansing to work at the RV show. (ECF No. 96-3, PageID 5894.) And according to Pianko, they were, even at night, subject to curfew and drinking rules, as well as the rules in the Employee Handbook. (ECF No. 96-3, PageID 5866–67.) This context supports the theory that Miller remained an agent of General throughout the entire overnight work trip.

Therefore, Miller's Motion for Summary Judgment on Pianko's ELCRA sex discrimination claim is **DENIED**.

**H. The Court GRANTS Baidas and Fowler's Motion for Summary Judgment on Pianko's ELCRA sex discrimination claim.**

Still, the ELCRA imposes individual liability for sex harassment only on those "agent[s] who," in fact, "sexually harass[] an employee in the workplace." *Elezovic*, 472 Mich. at 426. At the Hearing, Pianko agreed that she has not alleged that Baidas or Fowler personally sexually harassed her, and she agreed to dismiss her ELCRA sex harassment claim against them for that reason. Accordingly, Baidas and Fowler's Motion for Summary Judgment on that claim is **GRANTED**.

**I. The Court DENIES General's Motion for Summary Judgment on Pianko's Title VII retaliation claim.**

In addition to prohibiting sex discrimination, Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3. To establish a prima facie case of unlawful retaliation under this provision,

> [a] plaintiff must demonstrate that (1) they engaged in a protected activity, (2) the employer knew of the exercise of the protected right, (3) the employer took adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment by a supervisor, and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Wyatt*, 999 F.3d at 419.

The "plaintiff's burden at the prima facie stage 'is minimal' and easily met." *Id.* (quoting *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)).

Nonetheless, General argues that Pianko has failed to establish the third and fourth elements of a prima facie case of retaliation.[9]

For the reasons that follow, the Court, viewing the facts in the light most favorable to Pianko, finds that a reasonable jury could decide that Pianko has established both of these challenged elements.

1. *A reasonable jury could find that General's ordering Pianko back to work by March 19, 2018 was a materially adverse action.*

A retaliation "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68 (emphasis added) (internal quotation marks omitted). The word "material" "separate[s] significant from trivial harms." *Id.* But "the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69 (internal citation and quotation marks omitted). And the category of "adverse employment action" "is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 64.

---

[9] General does not dispute Pianko's assertion that she "reported Miller's misconduct to Joy Fowler" and "[t]his satisfied the 'protected activity' and 'notice' elements." (ECF No. 123, PageID 7164) (citing *Daniels v. Pike Cnty. Comm'rs*, 706 F. App'x 281, 288 (6th Cir. 2017); *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1067–68 (6th Cir. 2015); and *Delozier v. Bradley Cnty. Bd. of Educ.*, 44 F. Supp. 3d 748, 765 (E.D. Tenn. 2014)).

*Arguments*

Pianko argues that "Baidas's decision ordering [her] back to work or she would be fired and General[]'s failing to inform [her] of her leave options each are 'materially adverse' actions under . . . *White*, 548 U.S. [at] 68." (ECF No. 123, PageID 7165). "Per [*White*]," Pianko asserts, "'it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered "materially adverse" to the employee and thus constitute adverse employment actions.'" (ECF No. 123, PageID 7166) (internal alterations omitted) (quoting *Crawford v. Carroll*, 529 F.3d 961, 973 n.13 (11th Cir. 2008) and also citing *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) and *McArdle v. Dell Prods., LP*, 293 F. App'x 331, 337 (5th Cir. 2008)).

General argues that it is "simply untrue" that "ordering [Pianko] back to work and failing to inform her of her leave options were adverse actions taken due to her filing the sex harassment complaint," because Pianko "was provided unpaid leave from Friday, March 9 through Friday, March 15" and "was advised of her FMLA rights on March 14." (ECF No. 129, PageID 7431) (citing ECF Nos. 129-2 and 4); *see also* (ECF No. 96, PageID 5798) ("Plaintiff was [] offered by letter of March 14 to apply for FMLA leave if she felt unable to return to work, [but] she never did." (internal citation to ECF No. 96-12 omitted)). General also insists that "the letters to [Pianko], [Pianko's] pay records and the affidavits of [] Baidas and Fowler"

demonstrate Pianko "**was** provided" with "[n]o [p]ay [a]pproved leave." (ECF No. ECF No. 96, PageID 5797–98) (citing ECF Nos. 96-12, 13, 15, 16, and 17). On this point, it emphasizes that "the pay records show that [Pianko] . . . was not paid" "[i]n Period #7, March 11 – March 24." (ECF No. 96, PageID 5798) (citing ECF No. 96-17).

*Analysis*

Pianko's argument that General took a materially adverse action against her by failing to inform her of her leave options fails because it has no factual support. The record shows that General *did* inform Pianko of her FMLA leave options in Fowler's March 14 letter, which stated: "If you feel that you may be eligible for Family Medical Leave, please contact me for the paperwork required for this type of leave. You can reference your employee handbook under 'Unpaid Leave of Absence' for explanation of qualifying absences." (ECF No. 96-12, PageID 6009.) Pianko concedes that she never took Fowler up on this offer. (ECF No. 121-2, PageID 7049.)

However, Pianko's argument that General took a materially adverse action against her by ordering her back to work on March 19th creates a jury question. The Court will assume that the pay sheet provided by General proves that it provided her with the five "no pay approved" days that she was due, in accordance with General's

usual practice,[10] from March 12th to 16th. *See* ECF No. 96-17, PageID 6176 (showing that Pianko was paid only one "overtime hour" and no other hours for "Period 7"); ECF No. 96-16, PageID 6171 (explaining the company's "no pay approved" policy). (Pianko has not engaged with the pay sheet's contents at all, let alone offered a credible alternative reading of it.)

Even so, a reasonable jury could find that General took a materially adverse action against Pianko by prohibiting her from using her vacation days (and her personal day) during the week of March 19th. Indeed, Pianko specifically told Fowler on March 9th that she was willing to "use [her] vacation days" to avoid "coming into work at th[at] stage." (ECF No. 121-9, PageID 7135.) And Short testified that General had a practice of letting employees intersperse no pay approved leave and vacation days "based on the circumstance." (ECF No. 123-4, PageID 7272.) Yet, Fowler's March 14th letter flatly stated that Pianko's "[f]ailing to return

---

[10] Pianko suggests, in a later section of her brief, that General should have offered her more than five days of no pay approved leave because "'multiple' other General [] employees . . . received extended, unpaid leave (sometimes up to six to eight weeks) without being fired." (ECF No. 123, PageID 7169) (citing ECF No. 87-11, PageID 5242–44). She posits that "[t]he key to obtaining this extended leave was making sure there were others to take over the employee's job duties," and she states that "General [had] already cross-trained, and employed, other employees who could (and did) perform [her] job duties when she was away from work." (ECF No. 123, PageID 7169) (citing ECF No. 87-11, PageID 5242–44); (ECF No. 121-2, PageID 7049). But this suggestion is unpersuasive, because General gave those extended leaves near the end of the year to sales representatives who had already met their sales targets. (ECF No. 123-5, PageID 7375.) Pianko was not a salesperson and had not, in March, hit any yearly targets.

to work by [] March 19 [] w[ould] be considered a voluntary resignation," without any mention of an option to use vacation days. (ECF No. 96-12, PageID 6009.)

Viewing the letter in context and in the light most favorable to Pianko, it was reasonable for her to interpret it as implicitly forbidding her from using her vacation days. General has not offered any explanation for this prohibition: it has not, for example, shown that Pianko had no vacation days left at that time, nor that she could not request vacation on such short notice, nor that her absence would have created significant staffing issues. *Cf. Shivers v. Charter Commc'ns, Inc.*, No. 22-3574, 2023 WL 3244781, at *6 (6th Cir. May 4, 2023) (finding that "some denials of vacation requests according to [the defendant-company]'s policy, without more, is not an adverse employment decision"). And the prohibition could dissuade a reasonable employee from reporting future harassment, for fear that she too might be arbitrarily deprived of her freedom to use her accrued vacation days and forced into work shortly after her report, despite her discomfort and well-founded concern.[11]

---

[11] At the Hearing, General further argued that it did not take a materially adverse action against Pianko because it had a legitimate reason for firing her—her failure to return to work—and because Pianko did not raise the issue of her being deprived of vacation days in her Amended Complaint. But even if these arguments were timely, they would fail. First, the materially adverse action here is *not* General's firing Pianko; it is General's issuing the ultimatum that preceded the firing. Second, Pianko's Complaint sufficiently alleges that General issued this ultimatum and that General did so as a form of retaliation. *See* ECF No. 3, PageID 58, 66–67.

   *2. A reasonable jury could find that there was a causal connection between Pianko's protected activity and General's materially adverse action.*

"Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). The Sixth Circuit has held that "a two- to three-month time lapse between a plaintiff's protected activity and [the] occurrence of a materially adverse action is sufficient temporal proximity to satisfy a plaintiff's prima facie case of" causation. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 776–77 (6th Cir. 2018) (citing *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283–84 (6th Cir. 2012)).

"But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Mickey*, 516 F.3d at 525.

## *Arguments*

Pianko points out that "[t]here was only a **six [] day lapse** between [her] reporting Miller on March 8, 2018 and March 14, 2018 when General [] ordered [her] to return to work or she would be fired." (ECF No. 123, PageID 7164–65.) She argues that "[t]his temporal proximity satisfie[s] the causation element." (ECF No. 123, PageID

7165) (citing *Mickey*, 516 F.3d at 525; *Rogers*, 897 F.3d at 776–77; *Clark v. Walgreen Co.*, 424 F. App'x 467, 473 (6th Cir. 2011); and *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007)).

General does directly respond to this argument. However, it arguably addresses the causation issue where it emphasizes that "Fowler, on March 9, responded to [Pianko]'s complaint telling her 'She did the right thing'"; that Pianko "was advised that the company was concerned about her complaint, were taking it seriously and not to worry, she would not be retaliated against"; and that Pianko "has not made any allegation that anyone spoke poorly to her, shunned her, demoted her, or changed her terms of employment" (ECF No. 96, PageID 5798) (citing ECF Nos. 96-5, 96-18).

*Analysis*

As Pianko notes, there were only six days between her reporting Miller on March 8th and General ordering her back to the office, without giving her the option to take vacation, on March 14th. This short timeframe alone establishes the causation element of Piako's prima facie retaliation case. *Cf. Mickey*, 516 F.3d at 525; *Rogers*, 897 F.3d at 776–77.

Though she does not need it here, Pianko has additional evidence of causation too. For one thing, Short's testimony suggests that General often makes an effort to accommodate employees seeking to take time off for personal reasons, (ECF No.

34

123-4, PageID 7272)—a practice that tellingly contrasts with its rigid treatment of Pianko's situation. For another, Fowler and Baidas displayed some doubts about and hostility toward Pianko's complaint in their March 20th emails, in which they call Pianko "no angel," insinuate that she was partly to blame for going to Miller's hotel room, and plan to keep certain facts "in the arsenal" for use against her. (ECF No. 121-10, PageID 7140–42.)

Finally, it is inapposite that no one at General "spoke poorly" to Pianko after she reported Miller and that Fowler assured Pianko that she "did the right thing" and that her "job [was] not in jeopardy." (ECF No. 3-3, PageID 78; ECF No. 95-5, PageID 5979.) A company cannot use conclusory statements to shield itself from liability for its retaliatory actions.

All told, then, Pianko has established a prima facie case of retaliation at this stage. General has challenged only her ability to make that case; it has not argued that her claim should be dismissed for any other reason.[12] Therefore, General's Motion for Summary Judgment on Pianko's Title VII retaliation claim is **DENIED**.

---

[12] "Once a plaintiff establishes a prima facie case [of retaliation], 'the defendant has a burden of *production* to articulate a nondiscriminatory reason for its action. If the defendant meets its burden, the plaintiff must prove the given reason is pretext for retaliation.'" *Wyatt*, 999 F.3d at 419–20 (quoting *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015)). As noted above, General has not explained why it did not give Pianko the option to use her vacation days starting on March 14th. (It also has not replied to Pianko's argument that its purported reason for terminating her—that she did not return to work—was pretextual. *See* (ECF No. 123, PageID 7166–72.))

**J. The Court DENIES General's Motion for Summary Judgment on Pianko's ELCRA retaliation claim.**

Like Title VII, the ELCRA provides that "a person shall not . . . [r]etaliate or discriminate against a person because the person has opposed a violation of this act." M.C.L. § 37.2701(a). The ELCRA defines "person" to encompass, among other things, "individual[s], agent[s], association[s], [and] corporation[s]." M.C.L. § 37.2103(h).

"[T]he ELCRA analysis [of retaliation claims] is identical to the Title VII analysis [of such claims]." *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012). So, for the same reasons that General's Motion for Summary Judgment on Pianko's *Title VII* retaliation claim is denied, General's Motion for Summary Judgment on Pianko's *ELCRA* retaliation claim is also **DENIED**.

**K. The Court DENIES Baidas' Motion for Summary Judgment on Pianko's ELCRA retaliation claim and GRANTS Fowler's Motion for Summary Judgment on that claim.**

Baidas argues that "[t]he accusations against him do not set forth an individual cause of action . . . for violation of [the] ELCRA" because "[t]here are no allegations [that he engaged in] sexual misconduct at, or in the presence of [Pianko]." (ECF No. 96, PageID 5804.) But this argument does not address Pianko's retaliation claim. And in a sworn affidavit, Baidas attests that "it was [his] decision to terminate [Pianko's] employment if she failed to return to work after her leave." (ECF No. 96-

36

13, PageID 6012.) Therefore, Baidas' Motion for Summary Judgment on Pianko's ELCRA retaliation claim is **DENIED**.

On the other hand, Baidas' affidavit indicates that Fowler was not ultimately responsible for or in control of the alleged retaliation. For that reason, Pianko agreed at the Hearing to drop her ELCRA retaliation claim against Fowler. So Fowler's Motion for Summary Judgment on that claim is **GRANTED**.

### L. The Court DENIES Baidas' Motion for Summary Judgment on Pianko's tortious interference claim.

> The elements of tortious interference with a business relationship or expectancy are [(1)] the existence of a valid business relationship or expectancy, [(2)] knowledge of the relationship or expectancy on the part of the defendant, [(3)] an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and [(4)] resultant damage to the plaintiff.

*Cedroni Ass'n, Inc. v. Tomblinson, Harburn Assocs., Architects & Planners Inc.*, 492 Mich. 40, 45 (2012) (internal quotation marks omitted). The third element requires "the defendant's interference [to] involve either the intentional doing of a per se wrongful act *or* the doing of a lawful act with malice and unjustified in law for the purpose of invading the . . . business relationship of another." *Elias v. Fed. Home Loan Mortg. Corp.*, 581, F. App'x 461, 464 (6th Cir. 2014); *see also Auburn Sales, Inc. v. Cypros Trading & Shipping, Inc.*, 898 F.3d 710, 715–16 (6th Cir. 2018).

Additionally, "[t]o maintain a cause of action for tortious interference, the plaintiff[] must establish that the defendant was a 'third party' to the contract or business relationship." *Reed v. Mich. Metro Girl Scout Council*, 201 Mich. App. 10, 13 (1993). For that reason, "corporate agents are not liable for tortious interference with the[ir] corporation's contracts [and business relationships] unless they acted solely for their own benefit with no benefit to the corporation." *Id.*; *see also Ma v. Weber*, Nos. 330380 and 332462, 2017 WL 2607957, at *6 (Mich. Ct. App. June 15, 2017) (relaying the same requirement).

### *Arguments*

Baidas primarily argues that he was not a third party to Pianko's contract with General. To that point, he contends that he "at all times was acting within the scope of his authority as President." (ECF No. 96, PageID 5800.) "[A]s President of General," he explains, it "certainly was within his authority to conduct the investigation of [Pianko]'s complaint against [] Miller," to "offer [Pianko] a FMLA leave," and to decide to "terminat[e]" Pianko for failing to "return to work." (ECF No. 96, PageID 5801.) Baidas also claims that "[Pianko] has failed to show any evidence that [he] acted for his own benefit and with no benefit to [] General." (ECF No. 96, PageID 5801–02.) He asserts that "[t]erminat[ing] an employee who fail[s] to return to work [] is an action to benefit" General. (ECF No. 96, PageID 5802.) And he reasons that his allowing Miller to keep his job did not benefit him alone,

because "[i]f [] Miller generates money for [] Baidas [as a salesperson], he also generates money for [] General []," and "[t]here is no evidence that [] Baidas['] . . . relationship [with Miller] somehow increased or strengthened as a result" of the way Baidas handled Pianko's complaint. (ECF No. 96, PageID 5802.)

Additionally, Baidas argues that "[t]here is no evidence that his relationship with [] Miller affected his judgment or decision making or that he acted with malice or without justification." (ECF No. 96, PageID 5800.)

Pianko responds that "there is more than enough circumstantial evidence for the jury to decide whether Baidas used his authority to further his own ends or for the indirect purpose of tortuously interfering with [Pianko]'s job." (ECF No. 123, PageID 7173) (citing *Stack v. Marcum*, 147 Mich. App. 756, 760 (1985)). Pianko asserts that "Baidas's close friendship with Miller [] played a role in his treatment of [her]." (ECF No. 123, PageID 7174–75.) Further, she states that her "liability expert, Julie Moore, examined Baidas' actions and opined 'the personal relationship between Baidas and Miller was a factor that impeded Baidas's ability to be impartial' when he investigated P[ianko]'s charge of his misconduct." (ECF No. 123, PageID 7174) (citing and quoting ECF No. 62-4, PageID 2515, 2544–45.) (To Pianko's detriment, Moore also opined that "Baidas considered Miller to be such a 'valuable asset' to *General* [] that Baidas 'was incapable of impartially investigating a

complaint about Miller.'" (ECF No. 123, PageID 7174) (emphasis added) (citing and quoting ECF No. 62-4, PageID 2515, 2544–45).)

On the issue of malice, Pianko speculates that the email she sent to Baidas on March 14—in which she stated that she "fe[lt] like General [] [was] blaming [her] for what [Miller] did" and that Baidas' friendship with Miller was "changing the results" of the investigation, (ECF. No. 121, PageID 7048, 7054)—"upset Baidas" and inspired him to "issu[e] [the] ultimatum" requiring that she return to work. (ECF No. 123, PageID 7173–74.) Pianko also emphasizes that, on March 20, "Baidas and Fowler exchanged emails" in which they "vow[ed] 'to keep [information about her] in the arsenal'" and, in her view, "'slut sham[ed]' [her] for going to Miller's room." (ECF No. 123, PageID 7174) (citing ECF No. 121-10, PageID 7140–42.)

Baidas replies that Pianko's citation to *Stack* is "not applicable" because "[t]he court [there] did not address the level of wrongdoing necessary to establish a cause of action by the corporate officer, just whether a cause of action could exist against him." (ECF No. 129, PageID 7432.) And he maintains that "[Pianko] has not set forth how [] Baidas acted outside his authority as president of the company in investigating and disciplining [] Miller or in terminating [Pianko] for failing to return to work." (ECF No. 129, PageID 7433.) "[T]he only evidence set forth," Baidas contends, is [Pianko]'s opinion that [] Baidas would make more money if he did not

terminate a successful salesperson"; "but," he reiterates, "if [] Baidas made money so did the company." (ECF No. 129, PageID 7433.)

*Analysis*

Most of Baidas' conduct in this case at least partly benefitted General. To the extent that Baidas treated Pianko and Miller in accordance with General's policies, General benefitted, because its efficient operation depends upon the enforcement of those policies. And to the extent that Baidas treated Miller favorably because he was a good salesperson, General again benefited, because the sales that Miller generates increase General's revenue.

But a reasonable jury could find that Baidas tortiously interfered with Pianko's contract by issuing the ultimatum that she needed to return to work on March 19th or she would be fired, and in doing so, depriving Pianko of her freedom to use her vacation days. The Court has already explained that a reasonable jury could conclude that Baidas was retaliating against Pianko when he issued this ultimatum. *See* Sections I, K, *supra*. And if he was retaliating, then he was both intentionally doing a per se wrongful act and doing it with malice. This would satisfy the contested third element of Pianko' s claim. *See Elias*, 581, F. App'x at 464.

A reasonable jury could further find that Baidas was a third party to Pianko's contract when he issued the ultimatum. Again, the jury could conclude that Baidas was motivated to issue the ultimatum by his personal desire to retaliate against

Pianko. *See* Sections I, K, *supra*. The jury could also conclude that the ultimatum brought no benefit to General, because Baidas has not explained what that benefit might have been. He has not suggested that he deprived Pianko of her vacation days to comply with General policy, nor that he especially needed her back at work on March 19th, nor even that she was a bad worker and he wanted to incentivize her to quit for the good of the company. Plus, by retaliating, Baidas exposed General to legal liability and thereby *harmed* it. Many cases confirm that an agent acting based on animus is not acting for the benefit of his corporation. *See Burke v. Detroit Pub. Sch.*, No. 262983, 2006 WL 1156366, at *11 (Mich. Ct. App. May 2, 2006) ("A plaintiff merely must show that, rather than acting for and on behalf of the organization, the agent acted to further strictly personal motives. Here, plaintiff has presented a genuine issue of fact regarding whether Alexander was motivated by personal animus." (internal citation, quotation marks and alteration omitted)); *McKellar v. Bergen Brunswig Drug Co.*, No. 181946, 1997 WL 33354439, at *2 (Mich. Ct. App. Jan. 21, 1997) (implying that a plaintiff's tortious interference claim could survive if the plaintiff provided proof that "the individual defendants fabricated reasons for terminating their employment relationship" with him); *Cox v. Calumet Pub. Sch. Dist. 132*, 180 F. Supp. 3d 556, 564–65 (N.D. Ill. 2016) ("The agency privilege does not extend to bad-faith conduct engaged in by the defendant solely for its own benefit or for the sole purpose of harming the plaintiff. . . . If Cox

was a good employee, then an effort to discipline or fire him was contrary to the best interests of the corporation. It follows that if Reynolds engaged in such conduct, she was not furthering the best interests of her employer and was acting instead to further her own personal goals." (internal quotation marks omitted)); *Wenz v. Vantage Builders, Inc.*, No. 04-1020, 2005 WL 8163610, at *14 (D.N.M. Sept. 28, 2005) ("A supervisor who interferes with his subordinate's employment contract with a discriminatory motive is not acting in the best interests of his employer but is acting for his own interests. There is a fact issue with regard to Eberle's motive in terminating Plaintiff's employment." (internal citation omitted)).

Thus, Baidas' arguments for summary judgment on Pianko's tortious interference claim fail. His Motion for Summary Judgment on that claim is **DENIED**.

## M. The Court GRANTS General's Motion for Summary Judgment on Pianko's conspiracy claim and DENIES Baidas and Fowler's Motion for Summary Judgment on that claim.

"A conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a purpose not unlawful by criminal or unlawful means." *Fenestra Inc. v. Gulf Am. Land Corp.*, 377 Mich. 565, 593 (1966). Pianko's conspiracy claim is that "Defendants illegally, maliciously, and wrongfully conspired with each other and/or engaged in concerted

43

activities, with the intent of tortiously interfer[ing] with [her] employment relationship with General." (ECF No. 3, PageID 69.)

### Arguments

In their opening summary judgment brief, General, Baidas and Fowler "assume[]" that Pianko's conspiracy claim "is referring to [] Baidas and [] Miller." (ECF No. 96, PageID 5803.) From there, they "rel[y] on the earlier argument that [Pianko]'s claim of interference with contractual right is not viable, thus a conspiracy to interfere is not viable." (ECF No. 96, PageID 5803) (citing *Advoc. Org. for Patients & Providers v. Auto Club*, 257 Mich. App. 365, 384 (2003). They add that "no evidence of a conspiracy has arisen through [] discovery to support such a claim." (ECF No. 96, PageID 5803) (*Anderson*, 477 U.S. at 250 and *Lucas v. Leaseway Multi Transp. Serv., Inc.*, 738 F. Supp 214, 217 (E.D. Mich 1990)).

In her Response, Pianko's only mention of her conspiracy claim is an assertion that, "[w]hile Baidas may have made the ultimate decisions about [her] and her employment with General [], Fowler is liable, too, under a civil conspiracy theory . . . . The evidence shows Fowler knew about, and assisted, and conspired with Baidas in his tortious conduct." (ECF No. 123, PageID 7175) (citing *Franks v. Franks*, 330 Mich. App. 69, 113–14 (2019)).

General, Baidas, and Fowler reply that Pianko "has failed to set forth what evidence established such a conspiracy" and so, "[w]ithout such evidence, the cause of action must be dismissed against [] Fowler." (ECF No. 129, PageID 7433.)

*Analysis*

At the Hearing, Pianko clarified that she brings this case against Baidas and Fowler, but not General. Therefore, General's Motion for Summary Judgment on Pianko's conspiracy claim is **GRANTED**.

Also at the Hearing, Pianko agreed that if her tortious interference claim against Baidas fails then her conspiracy claim must fail too. But the Court has found that Pianko's tortious interference claim can proceed to trial. *See* Section L, *supra*. So her conspiracy claim does not fail on that basis.

Finally, Baidas and Fowler's contention that Pianko has not submitted any evidence to support her conspiracy claim is unavailing. This contention has not been adequately briefed by either side.[13] And, the Court briefly notes, the record raises genuine disputes over whether Baidas tortiously interfered with Pianko's contract

---

[13] Moreover, General, Baidas, and Fowler's original motion assumed that Pianko's conspiracy claim did not apply to Fowler and so did not technically move for summary judgment on that claim on Fowler's behalf. (ECF No. 96, PageID 5803.) While Fowler explicitly moved for summary judgment on the claim in General, Baidas, and Fowler's reply brief, that is too late to raise a new argument. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("[W]e have found issues to be waived when they are raised for the first time in motions requesting reconsideration or in replies to responses."); *Czerwinski v. Gallagher*, -- F. Supp. 3d --, 20-cv-12091, 2023 WL 2505892, at *2 n.2 (E.D. Mich. Mar. 14, 2023).

with General, *see* Section L, *supra*, and over whether Fowler took action to help Baidas do so, by, for example, sending the letter containing the ultimatum to Pianko, *see* ECF No. 96-12, PageID 6009.

Accordingly, Baidas and Fowler's Motion for Summary Judgment on Pianko's conspiracy claim is **DENIED**.

### Conclusion

For the reasons discussed above, the Court:

1.  **DISMISSES** Pianko's Title VII claims against Miller;

2.  **DENIES** General's Motion for Summary Judgment on Pianko's Title VII sex discrimination claim;

3.  **DENIES** General's Motion for Summary Judgment on Pianko's ELCRA sex discrimination claim;

4.  **DENIES** Miller's Motion for Summary Judgment on Pianko's ELCRA sex discrimination claim;

5.  **GRANTS** Baidas and Fowler's Motion for Summary Judgment on Pianko's ELCRA sex discrimination claim;

6.  **DENIES** General's Motion for Summary Judgment on Pianko's Title VII retaliation claim;

7.  **DENIES** General's Motion for Summary Judgment on Pianko's ELCRA retaliation claim;

8.  **DENIES** Baidas' Motion for Summary Judgment on Pianko's ELCRA retaliation claim and **GRANTS** Fowler's Motion for Summary Judgment on that claim;

9.  **DENIES** Baidas' Motion for Summary Judgment on Pianko's tortious interference claim; and

10. **GRANTS** General's Motion for Summary Judgment on Pianko's conspiracy claim and **DENIES** Baidas and Fowler's Motion for Summary Judgment on that claim.

Pianko's remaining claims are for:

1. Sex Harassment Discrimination in Violation of Title VII (against General);

2. Sex Harassment Discrimination in Violation of the ELCRA (against General and Miller);

3. Retaliation in Violation of Title VII (against General);

4. Retaliation in Violation of the ELCRA (against General and Baidas);

5. [Nothing: Pianko's tortious interference claim against Miller has been dismissed entirely];

6. Tortious Interference with a Business Relationship (against Baidas);

7. Civil Conspiracy/Concert in Action (against Baidas and Fowler);

8. Intentional Infliction of Emotional Distress (against Miller); and

9. Assault & Battery (against Miller).

**IT IS SO ORDERED.**

Dated: June 9, 2023_____

s/Paul D. Borman_____
Paul D. Borman
United States District Judge